**WOODLEY PARK COMMUNITY ASSOCIATION, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

**Washington-Sheraton Corporation, Intervenor.**

**WASHINGTON–SHERATON CORPORATION, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

Nos. 83–1276, 84–10.

District of Columbia Court of Appeals.

Argued Dec. 12, 1984.

Decided April 11, 1985.

---

William H. Carroll, Charlestown, Mass., for Woodley Park Community Ass'n.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Whayne S. Quin, Washington, D.C., with whom Norman M. Glasgow, Jr., Larry B. Blackwood, Thomas G. McGarry, James Bruce Davis and Hershel Shanks, Washington, D.C., were on the briefs, for Washington-Sheraton Corp.

Before PRYOR, Chief Judge, and NEBEKER and MACK, Associate Judges.

PRYOR, Chief Judge:

In this case, the Woodley Park Community Association ("WPCA") petitions for review of the District of Columbia Board of Zoning Adjustment's denial, in part, of its challenge to permits issued to the Washington-Sheraton Corporation ("WSC") for construction and occupancy of the Washington Sheraton Hotel.[1] In a consolidated appeal, WSC, intervenor below, cross-petitions for review of the denial by the Board of Zoning Adjustment ("BZA") of its motion to dismiss WPCA's appeal; in addition, it challenges the BZA's ruling respecting the number of required parking spaces.

In its presentation to the BZA, WPCA challenged permits issued to the WSC by the Zoning Administrator claiming that the building and roof structures of the hotel violate the height and setback requirements of the residential district in which it is located, the convention center use of the hotel is not an accessory use, the number of parking spaces provided is less than the number required, no valid parking plan was submitted, and the parking spaces are not reasonably accessible and convenient to users. WSC moved to dismiss WPCA's appeal, asserting that the appeal was both untimely filed, and also barred by the doctrines of laches and estoppel.

In its order, the BZA denied WSC's motion to dismiss the appeal, finding it timely and not barred by laches or estoppel. On the merits, the BZA rejected WPCA's claim as to height, setback, accessory use, and

---

1. Prior to renovation in 1979, the name of the hotel was the Sheraton-Park Hotel.

inaccessibility of parking spaces. The BZA did accept WPCA's contention that the number of parking spaces required by the Zoning Administrator was incorrect, and ordered an increase of seventy spaces, to a total of 649. Because the projected number of parking spaces was deemed incorrect, the BZA concluded that the parking plan was defective.[2]

In this court, WPCA challenges the BZA's findings on height, setback, accessory use, and parking; in a similar fashion, WSC renews its motion to dismiss. While supporting the BZA's other findings on the merits, WSC challenges the BZA's calculation of the required number of parking spaces as not based on substantial evidence in the record.

For the reasons stated herein, we find the challenge before the BZA on the issues of height, setback, and accessory use to be untimely. Therefore, as to these issues, we reverse the BZA's denial of WSC's motion to dismiss. We find WPCA's appeal on parking to be timely, and we further hold that consideration of this issue is not barred by laches or estoppel. On the merits of the parking issue, we conclude that substantial evidence in the record supports the BZA's calculation of the required number of spaces at the Washington Sheraton Hotel, and we therefore affirm this aspect of the BZA order.

I

In the early part of December 1976, Mr. Leslie Norden Schwiebert, Managing Director of the Sheraton-Park Hotel, met with representatives of WPCA to inform them of plans for reconstruction of the hotel. The reconstruction program, anticipated to cost $45 million, contemplated the construction of a new hotel building behind the then-existing main building, and expansion of exhibit and conference facilities. At the meeting, Schwiebert stated that WSC wanted to avoid a BZA appeal by WPCA as had occurred with a 1973 rebuilding plan. He also stated that he knew that the "doubling" of convention space would be of concern to the community, but he thought that existing garage parking supplemented by a surface lot would adequately handle traffic generated by the additional convention use. Finally, Schwiebert sought WPCA's assistance in providing for a unified review of WSC's rebuilding plans by community organizations and individuals.

In response to this request, a Task Force on the Rebuilding of the Sheraton-Park Hotel ("Task Force") was organized.[3] A series of meetings between Task Force members and WSC representatives was held in late December 1976, and in early January 1977. At these meetings, WSC representatives presented drawings and outlined plans for the rebuilding program.

Central to these discussions was a drawing of the completed project prepared by the architectural firm retained by WSC. This drawing depicted a final hotel structure set back from Woodley Road and preserving the parklike front of the hotel. In connection with the building and grounds depicted in the drawing, WSC representatives advised the Task Force that there would be 900 off-street parking spaces and parking for 35 to 40 buses at the hotel and an inner loop that would allow traffic to enter the hotel site on 24th Street, N.W., and to exit via Calvert Street or Woodley Road. They also represented that an additional 150 to 200 parking spaces could be

---

2. The BZA ordered WSC to submit revised plans to the Zoning Administrator, within 60 days, showing where and how the required 649 spaces would be provided. The BZA further ordered that if a suitable plan for 649 spaces was not submitted, appropriate action would be taken "to see that the Sheraton shall not operate or occupy more rooms or suites of rooms than the number for which it has provided sufficient parking...." WSC has complied with the BZA order that 649 spaces be provided.

3. The Task Force included representatives of Advisory Neighborhood Commission 3C, the Cleveland Park Citizens Association, the Saint Thomas Apostle Parish Council, and WPCA.

provided in lieu of grass in the northwest corner of the property.[4]

Members of the Task Force were sharply divided on the question of whether to pursue negotiations with WSC. The rebuilding plans were presented to the Woodley Park community at a town meeting on January 27, 1977.[5] Based on WSC's representations, the community urged the Task Force to attempt resolution of community concerns over the rebuilding through negotiation and mutual agreement with WSC.

On February 21, 1977, the Task Force sent a report on the rebuilding to WSC. The cover letter to this report succinctly stated the Task Force's awareness of the choice it had made in pursuing negotiations:

> While we continue to hold the view that the Sheraton Convention Hotel complex is a "non-conforming structure" as well as a "non-conforming use", the community is generally supportive of your plans. Our report is an outline for resolving the community's concerns by agreement with the Sheraton Corporation.

The report addressed Task Force concerns in three areas: perceived benefits to

the community, perceived losses to the community, and matters requiring "additional review ... and continued dialogue...." Topics addressed included traffic (pedestrian and vehicular), parking, landscaping and environment, recreation and amenities, and construction. As reflected in the report, the Task Force was not concerned exclusively with issues such as parking and traffic posing a threat to the quality of community life: the Task Force sought also to maximize benefits to the Woodley Park community offered by the project.[6]

During the negotiations, the Task Force report evolved into a proposed WSC and Task Force Joint Statement on Rebuilding Project ("Joint Statement"). The goal of the negotiations was to reach agreement on the Joint Statement and have the document signed by both parties. From February 21, 1977 through May 18, 1979, nine drafts of the Task Force report and Joint Statement were exchanged. The Joint Statement, however, was never signed.

As negotiations between WSC and the Task Force proceeded, they focused increasingly on the issue of parking.[7] Be-

---

**4.** The Task Force was also informed by Mr. William Middleton, a member of the Municipal Planning Office, that the proposed plans did not appear to violate any zoning regulations.

**5.** The meeting was attended by approximately 135 Woodley Park residents.

**6.** For example, while concerns about parking and traffic are discussed prominently in the report, also mentioned are "recreation and amenities." Among the concerns listed under the latter topic are the following:

> A. Perceived Benefits to the Community
>
> * * * * *
>
> 18. There will be two permanent swimming pools (and additional wading pools) available for neighborhood membership.
>
> 19. The new hotel will have a full range of entertainment, recreation, health and shopping facilities for which neighborhood access will be encouraged.
>
> * * * * * *
>
> C. Matters Requiring Additional Review by Hotel and Continued Dialogue with Community
>
> * * * * * *

> 29. Provide year-round swimming facilities.
>
> 30. Provide ice-skating rink.
>
> 31. Provide tennis facilities.
>
> 32. Provide for roof top restaurant.

**7.** A comparison of early drafts of the Joint Statement shows that the two sides sharply disagreed on the number of parking spaces to be provided. According to WPCA, WSC's initial representation was that the development plans for the hotel included 900 off-street parking spaces. By February 21, 1977, the Task Force apparently believed that WSC planned to provide 980 off-street parking spaces. Thus, their February 21, 1977 report requested that WSC, "increase the planned overnight 980 parking spaces by 220 to provide a total of 1200 parking spaces...." WSC's response on March 18, 1977, however, contained no specific representation as to the number of off-street parking spaces to be provided. In fact, at no time did a WSC draft of the Joint Statement contain a commitment to provide a specific number of parking spaces. In their November 2, 1977 draft of the Joint Statement, for example, WSC stated only that

cause parking and traffic were a primary concern, in March 1977, WSC agreed to undertake a traffic study to evaluate existing problems as well as new problems posed by the development.[8]

In August 1977, WSC applied to the District of Columbia for a building permit to start the new construction. As part of the application, WSC submitted building plans which included 798 parking spaces. On April 27, 1978, the Chief of the Zoning Review Board approved WSC's application for a full building permit, including the 798 parking spaces. As part of the permit review process, employees of the Zoning Office prepared an internal memorandum called a "calculation sheet," which indicated that to meet the requirements of the zoning regulations, WSC would have to provide 751 parking spaces.[9] This calculation sheet, however, was not made a part of the building permit which was issued on October 6, 1977.[10]

In early December 1977, while WSC's building permit application was pending, Task Force members met with Mr. James J. Fahey, Zoning Administrator, to discuss their concerns about the proposed building plans. At the meeting, Mr. Fahey informed Task Force members that, while he had not completed review of WSC's building plans, his preliminary opinion was that they did comply with the zoning regulations.

> [t]he hotel recognizes that we have not provided the requested 1200 spaces. We will do everything possible to get maximum use out of our parking facilities and to minimize street parking.

**8.** In June 1977, Barton-Aschman Associates, Inc. was retained by WSC to conduct a study to develop recommendations for minimizing the impact of hotel-generated traffic on residential areas of Woodley Park. General agreement on the study elements was reached in August 1977, and a draft of the Barton-Aschman study was delivered to WSC and the Task Force on February 5, 1979.

**9.** 11 DCMR § 7202.1 (1977) requires that hotels provide one parking space for every two sleeping rooms or suites. WSC's building permit application represented that the completed

Following the meeting, the Task Force sent Fahey a letter dated December 5, 1977, summarizing its concerns. According to the Task Force, the proposed convention hotel complex did not comply with the setback or rear yard requirements of the zoning regulations, exceeded the height permitted in the R–5–B Zone, and would "result in a structure that continues a nonconforming use ...," that is, the convention use would be another primary use rather than an accessory use.[11] The letter forthrightly stated the Task Force's opinion as follows: "we do not believe the proposed new building meets fundamental requirements of the zoning regulations...."

In the letter, the Task Force articulated the difficult choice it faced between continuing negotiations and pursuing an administrative challenge to the building permit:

> We are hopeful that these discussions (with WSC) ... will enable the community and Sheraton to achieve their respective objectives. However, many intangible aspects of this process ... compel the community to avoid sleeping on its rights and to seek further assurance that its concerns will be alleviated.

At this point, the Task Force chose to continue negotiations rather than to file an appeal.[12]

structure would contain 1502 units. Thus, the zoning office calculated that 751 parking spaces would be required at the new hotel.

**10.** It is clear, therefore, that in negotiations with WSC, the Task Force sought to have WSC provide parking spaces in excess of the number required under the zoning regulations.

**11.** As a nonconforming primary use, the convention facilities at the hotel would not be permitted as a matter of right under zoning regulations.

**12.** Among the factors that influenced the Task Force's decision to continue negotiations, according to WPCA, were the following: WSC's replacement of its November 7, 1977 letter with a new response dated December 8, 1977; agreement by WSC representatives to document rep-

During 1978, negotiations between WSC and the Task Force continued. On January 27, 1978, the Task Force sent WSC a response to their December 8, 1977 draft of the Joint Statement. In April 1978, WSC responded, with a draft containing important changes in its representations. First, as to the parking issue, WSC's draft dropped all mention of a specific number of spaces.[13] Second, WSC's draft dramatically weakened the representation as to the on-site traffic loop, a major concern of the Task Force.[14]

On September 13, 1978, the Task Force responded to WSC's April draft. This response recognized the weakened position as to the traffic loop and objected to it. More importantly, the Task Force recognized the parties' inability to agree on the parking issue and returned a draft of the Joint Statement that reflected a willingness to complete negotiations on the document despite sharp differences on parking.[15]

In September 1978, therefore, the Task Force again directly confronted the difficult choice of continuing negotiations or pursuing an administrative appeal. The Task Force articulated the dimensions of this choice in the cover letter to WSC accompanying their September 13, 1978 draft of the Joint Statement:

[G]iven the complexity of the issue ... it is extremely unlikely that the Hotel own-

ers and the community could ever come to agreement on a precise number of parking spaces that the Hotel should provide.

This places us in somewhat of a quandary. In its entirety, the joint statement is a pretty good document, reflecting diligence, perseverance, and good-faith efforts by both parties to resolve differing perspectives. Yet parking is so important, the question has to be asked,—what good is agreement on the other points if the community is going to get hurt on the parking issue. After somewhat intense deliberations we decided to pursue the joint statement for several reasons.

While of a lesser magnitude than parking spaces, the other issues are important to area residents. And, while we can't mutually define the needed number of spaces, the Hotel and community are in accord on the principle of the Hotel's maximizing off-street parking.

Thus, despite the fact that the Task Force had full knowledge both that sharp differences on the parking issue existed and that problems had emerged regarding the traffic loop, it decided to continue negotiations.

On October 6, 1978, a building permit for the hotel was issued.[16] Construction work began immediately.

resentations in a formalized "Joint Statement;" a promise by WSC to include its representations to the community as a condition of any sale of the property; and impending completion of the Barton-Aschman Traffic study. Also militating against an appeal was the fact that the Task Force had been told in January 1977 (by Mr. Middleton) and in December 1977 (by Mr. Fahey) that WSC's building plans appeared to comply with D.C. Zoning Regulations.

13. Earlier drafts had explicitly mentioned the Task Force request for 1200 spaces, even while rejecting it. This draft stated only, "[t]he Hotel will do everything possible to get maximum use out of its parking facilities and to minimize street parking."

14. Unlike previous WSC drafts of the Joint Statement, which appeared to assume that a traffic loop would be provided, the April draft stated that the results of the Barton-Aschman

study "will be reviewed with the community and taken into account in reaching the final decision on this on-site loop."

15. In its draft of the Joint Statement, the Task Force included separate sections outlining the Task Force's and WSC's positions on parking. The Task Force first set forth its position that WSC was legally obligated—because of prior BZA actions and an increase in hotel rooms—to provide 1103 parking spaces. The Task Force then stated WSC's position that "its planned 750 parking spaces not only fulfill city regulatory requirements, but also will provide the number of parking spaces required to meet peak demand."

16. The full building permit was approved on April 28, 1978. An initial permit for excavation had been issued on January 6, 1978, and a foundation building permit was issued March 3, 1978.

In late February and early March 1979, the Task Force and WSC reviewed the draft of the Barton-Aschman study of parking and traffic problems submitted February 5, 1979. The study concluded that an estimated 850 parking spaces were necessary and that only approximately 750 were planned. Also during this period, the Task Force learned for the first time of the calculation sheet prepared by zoning officials, indicating that only 751 spaces were required to comply with the zoning regulations.[17]

Increasingly convinced that WSC representations could not be relied upon, the Task Force undertook a count of the number of parking spaces at the hotel. The Task Force's physical count of spaces revealed that only 595 spaces existed.

As a result of the traffic study, information about the calculation sheet, and the physical count of spaces, WPCA informed WSC that it could not continue negotiations until furnished with a plan showing the precise location of parking spaces to be included at the hotel. On May 31, 1979, WSC furnished plans showing 750 spaces. Of these spaces, 225 were on the front lawn of the property, and 525 were in the garages.[18]

In June 1979, the Task Force met with the Zoning Administrator to report on the status of negotiations and to share its concerns about WSC plans. The Zoning Administrator acknowledged that the drawing of parking spaces furnished on May 31, 1979 and the physical count of spaces conducted by the Task Force indicated that WSC had not provided parking spaces in accordance with information submitted along with its building permits. The Zoning Administrator informed the Task Force that he could take no action, however, until WSC applied for an occupancy permit.

In August 1979, as part of its application for certificates of occupancy for the new building, WSC submitted revised plans to the Zoning Administrator providing for 595 parking spaces, over two hundred fewer than had been approved as part of the building permit. According to WSC's revised plans, the completed hotel would contain 1366 units, not 1502 as represented earlier. In addition, WSC asserted that no parking spaces were required for the 209 units in the Wardman Tower, because this structure had been constructed before applicable zoning regulations went into effect in 1958. Thus, WSC claimed that after the 209 Wardman Tower units were subtracted from the hotel's total of 1366 units, only one space for every two of the remaining 1157 units would be required to comply with the zoning regulations. The Zoning Administrator agreed with WSC and revised the computation sheet to reflect that only 579 parking spaces were required, and that 595 were being provided.

On September 12, 1979, WSC was issued occupancy permits for 320 of 945 new units. One month later, on October 10, 1979, WPCA filed its appeal with the BZA.

## II

■ The threshold issue presented is whether WPCA's administrative appeal of building and occupancy permits issued to WSC was timely. The question of timeliness is jurisdictional. *Goto v. District of Columbia Board of Zoning Adjustment,* 423 A.2d 917, 923 (D.C.1980). Consequently, if WPCA's appeal was not timely filed, the BZA was without power to consider it. *Id.*

■ The Supplemental Rules of Practice and Procedure before the Board of

---

17. Also at this time, the Task Force learned that WSC's final plans for the hotel did not include the traffic loop.

18. The Task Force believed that the location of the 225 parking spaces spread across the front lawn of the hotel contradicted earlier represen-

tations by the WSC that the parklike front of the hotel would be preserved. Moreover, the number of spaces listed by WSC in the parking garages was higher than the physical count of spaces in the garages obtained by the Task Force.

Zoning Adjustment ("Supplemental Rules") provide, in part:

> Any person aggrieved by any order, requirement, decision, determination, or refusal made by any administrative officer or body ... in the administration or enforcement of the Zoning Regulations, may file a *timely* appeal with the Board.

22 DCRR § 2.21 (1972) (emphasis added). Because the rules of the BZA adopt no specific time limit on appeals, a standard of reasonableness is applied in determining whether an appeal is timely. *Goto v. District of Columbia Board of Zoning Adjustment, supra,* 423 A.2d at 923; *see also State ex rel. Housing Authority v. Wind,* 337 S.W.2d 554, 558 (Mo.App.1960); *Cave v. Zoning Board of Appeals,* 49 A.D.2d 228, 231, 373 N.Y.S.2d 932, 935 (1975), *app. denied,* 38 N.Y.2d 710, 382 N.Y.S.2d 1030, 346 N.E.2d 829 (1976). In applying the reasonableness standard, courts have consistently held that the time for filing an appeal commences when the party appealing is chargeable with notice or knowledge of the decision complained of. *E.g., Arkae Development, Inc. v. Zoning Board of Adjustment,* 312 N.W.2d 574, 577 (Iowa 1981); *State ex rel. Green's Bottom Sportsmen, Inc. v. St. Charles County Board of Adjustment,* 553 S.W.2d 721, 724–25 (Mo.App. 1977); *Ostrowsky v. City of Newark,* 102 N.J.Eq. (1 Backes) 169, 174–75, 139 A. 911, 913 (1928); *Pansa v. Damiano,* 14 N.Y.2d 356, 359–60, 251 N.Y.S.2d 665, 668, 200 N.E.2d 563, 565 (1964); *Hartunian v. Matteson,* 109 R.I. 509, 519–25, 288 A.2d 485, 490–93 (1972).[19]

■ Here, the BZA found that WPCA's appeal as to all issues was "reasonably asserted" and filed in a "timely manner." In reviewing this determination, we are mindful that "[w]e accord great deference to an agency's interpretation of its own administrative regulations, and we will uphold that construction unless clearly erroneous or inconsistent with the regulations." *Dupont Circle Citizens Association v. District of Columbia Zoning Commission,* 431 A.2d 560, 565 (D.C.1981); *see also Sheridan-Kalorama Neighborhood Council v. District of Columbia Board of Zoning Adjustment,* 411 A.2d 959, 961 (D.C. 1979).[20] For purposes of clarity, our review of the BZA's findings on the issue of timeliness is in two sections. The first section addresses the timeliness of WPCA's appeal on the number of parking spaces required at the hotel. The second section addresses the timeliness of the appeal as to the issues of height, setback, and use.

### A.

Review of the dispute over parking at the Washington Sheraton Hotel clearly shows that the BZA did not err in finding WPCA's appeal on this issue to be timely. WSC's original building plans were submitted to the Zoning Administrator in August 1977. These plans, approved as part of the building permit, provided for 798 parking spaces at the hotel. On October 6, 1978, the full building permit for construction of the hotel was issued.

In August 1979, as part of its application for a certificate of occupancy, WSC submitted revised plans to the Zoning Administrator. These plans provided for only 595 parking spaces. The Zoning Administrator agreed with WSC's assertions that only 579 parking spaces were required to meet the requirements of the zoning regulations. On September 12, 1979, WSC was issued a partial occupancy certificate that incorporated these new parking calculations. WPCA's appeal was filed with the BZA on

---

**19.** Under the zoning regulations, an appeal will lie from "any decision of an administrative officer granting or refusing a building permit or granting or withholding a certificate of occupancy or any other administrative decision based [i]n whole or part upon any zoning regulations or zoning maps adopted pursuant to the Zoning Act." 11 DCRR § 8102.1 (1977).

**20.** The BZA's conclusion is entitled to additional deference because the agency was interpreting its own internal rule of procedure rather than the zoning regulations. *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra,* 431 A.2d at 565.

October 12, 1979, one month after the certificate of occupancy was issued.

WPCA was "chargeable with notice" of the Zoning Administrator's approval of revised plans requiring only 595 spaces at the Washington Sheraton Hotel only as of September 12, 1979.[21] Thus, WPCA's appeal was filed only one month after receiving notice of the Administrator's decision dramatically reducing the required number of parking spaces.[22] This interval of one month between notice and filing of an appeal was reasonable. *Goto v. District of Columbia Board of Zoning Adjustment, supra,* 423 A.2d at 924 (delay of two months in filing appeal reasonable); *see also Keating v. Zoning Board of Appeals,* 325 A.2d 521, 524–25 (Me.1974) (60 days is reasonable appeal period). We, therefore, find no error in the ruling that this aspect of WPCA's appeal was timely.

### B.

The chronology of events relating to the timeliness of the appeal of height, setback, and use contrasts sharply with that on parking. In December 1976, and January 1977, members of the Task Force met with representatives of WSC to review plans for the proposed hotel redevelopment. As to the issues of height, setback, and use, the plans presented at these meetings were substantially similar to those objected to in WPCA's appeal.

Soon after reviewing the development plans, the Task Force recognized that possible grounds for appeal existed on the issues of height, setback, and use. On February 21, 1977, the Task Force sent WSC its initial report on the plans. In this report, the Task Force articulated its "view that the Sheraton Convention Hotel complex is a 'non-conforming structure' as well as a 'non-conforming use'...." Later, on December 5, 1977, the Task Force wrote to the Zoning Administrator and outlined objections to the development plans on the basis of violations of setback, rear yard, and height regulations, as well as an incorrect determination that hotel convention activities constituted an accessory use.

Thus, by October 6, 1978—the date the full building permit was issued—the Task Force had full actual notice of the aspects of the building project relating to height, setback, and use. Nevertheless, one year elapsed between the issuance of the building permit and the filing of the appeal on October 12, 1979. During this time, construction work on the hotel was commenced and substantially completed.

On this factual record, we conclude that as to height, setback, and use, the one-year delay from the issuance of the building permit to the filing of the appeal was not reasonable. *See Maroney v. Friere,* 74 Misc.2d 339, 340, 343 N.Y.S.2d 183, 185 (N.Y.Sup.Ct.1973) (delay of 127 days unreasonable); *In re Building Permit and Zoning,* 29 N.C.App. 749, 751, 225 S.E.2d 647, 649 (delay of 14 months unreasonable), *cert. denied,* 290 N.C. 661, 228 S.E.2d 451 (1976). Thus, we find the BZA's conclusion that the WPCA's appeal as to these issues was timely to be "not in accordance with law." D.C.Code § 1–1510(a)(3)(A) (1981). Consequently, the BZA lacked jurisdiction to consider WPCA's appeal of these issues.

WPCA argues, however, that WSC's conduct during negotiations renders its appeal timely as to all issues. WPCA claims that throughout negotiations, WSC misrepresented its actual final plans for parking and traffic circulation at the hotel. An earlier appeal was not filed, WPCA ex-

---

**21.** WPCA was aware in June 1979, of the substantial likelihood that WSC would not provide the number of parking spaces called for in the building plans. However, WPCA was not chargeable with notice of the Zoning Administrator's approval of the reduction in the required number of spaces until the occupancy permit was issued.

**22.** At no time during negotiations did WPCA receive notice that WSC planned to provide fewer spaces than the 798 called for in the building permit. Thus, nothing that transpired during negotiations provided WPCA with notice earlier than September 12, 1979, of the lower number of spaces to be provided.

plains, because of WSC misrepresentations that misled the Task Force into believing that its concerns on parking and traffic circulation would be accommodated. According to WPCA, once it became known that WSC's representations were misleading, an appeal was promptly filed. WPCA asserts that viewed in the context of WSC's conduct,[23] its delay in filing its appeal was reasonable, and its appeal was, therefore, timely.[24] We disagree.

The record underlying this appeal reveals two parties—WSC and the Task Force—engaged in complex and difficult negotiations over matters of great concern to both sides. WSC initiated negotiations, at least in part, to avert a lengthy and time-consuming appeal of its development plans. WPCA participated in negotiations in order to minimize harm and maximize benefits to its community from the hotel expansion.[25] Both sides hoped to realize gains if negotiations were successful, and faced potential losses if negotiations failed.

Proceeding concurrently with these negotiations was the lengthy administrative process undertaken by the WSC to obtain approvals for permits required for renovation of the hotel. Throughout its dealings with WSC, WPCA faced the difficult choice of continuing negotiations with the goal of reaching an agreement responsive to community concerns, or pursuing the alternate route of an administrative challenge to WSC's development plans. WPCA was fully aware of this choice throughout the negotiations.

WPCA chose to continue negotiations until June 1979, when they elected to pursue an administrative appeal.[26] In deciding to continue negotiations until this late date, WPCA was fully aware of the sharp differences that existed between the parties on parking, and that problems had emerged in regard to the traffic loop. Indeed, as early as September 12, 1978—one month before the building permit was issued—the Task Force informed WSC of its decision to continue negotiations despite a failure to agree on parking. This choice, WPCA stated, was made after "intense deliberations" and because of other issues "important to area residents."

WSC engaged in hard bargaining during negotiations with the Task Force.[27] Nevertheless, WSC's behavior does not eliminate WPCA's responsibility for the negotiating choices it made. WPCA cannot now escape the harsh consequences of its one-year delay in appealing because WSC—its adversary in difficult negotiations—was less than fully candid. While the circumstances presented here certainly make WPCA's one-year delay in appealing the building permit understandable, they do not make it reasonable for purposes of timeliness.

### III

Because we have concluded that only the appeal as to parking is timely, we need

---

**23.** In its reply brief, WPCA characterizes WSC's conduct as follows: "WSC initiated, nurtured and manipulated discussions and negotiations with WPCA for the express purpose of deterring WPCA from seeking review by the BZA of its applications to build and occupy the Sheraton Washington."

**24.** While it is difficult to determine the BZA's precise reasoning for finding the appeal as to these issues timely, it does appear that some elements of this argument were accepted. The BZA concluded:

> The [WPCA] expected that it would be satisfied by the Sheraton as to the number of parking spaces, which was its principal concern. Upon discovering that the District of Columbia was on record as stating that only 579 spaces were required, and only 595 spaces

were to be provided, the appeal was promptly filed.

**25.** *See supra* note 6 (quoting, in pertinent part, the February 21, 1977 Task Force Report on perceived benefits and losses to the community from the proposed development plans).

**26.** The appeal was not actually filed until October 1979, because the Zoning Administrator informed the Task Force that nothing could be done until WSC applied for certificates of occupancy.

**27.** We note, however, that the BZA concluded, "[i]t is difficult for the Board to determine whether either party was not acting in good faith."

consider only whether the appeal as to this issue is barred by laches and estoppel. We find the doctrines of laches and estoppel inapplicable to WPCA's appeal on the parking issue.

 In order to make out a claim for laches, a party must establish " 'omission to assert a right for *an unreasonable and unsatisfactorily explained length of time* under circumstances prejudicial to the party asserting laches.' " *Wieck v. District of Columbia Board of Zoning Adjustment,* 383 A.2d 7, 11 (D.C.1978) (quoting 3 RATH-KOPF, LAW OF ZONING AND PLANNING 67–1 (3d ed. 1972)) (emphasis added); *see also Goto v. District of Columbia Board of Zoning Adjustment, supra,* 423 A.2d at 925. We find neither element of laches present in this situation.

As discussed above, WPCA filed its administrative appeal on the issue of parking only one month after becoming chargeable with notice of the Zoning Administrator's recomputation of parking requirements. More importantly, WSC was not prejudiced by the one-month delay because it was not until September 12, 1979, that it received authorization from the Zoning Administrator to provide a lesser number of parking spaces than called for in the original building plans. Nothing in the record indicates that WSC acted in reliance on this authorization prior to the time WPCA filed its appeal.

 The elements required to establish estoppel are: "a party (1) acting in good faith, (2) on affirmative acts of a municipal corporation, (3) makes expensive and permanent improvements in reliance thereon, and (4) the equities strongly favor the party invoking the doctrine." *Wieck v. District of Columbia Board of Zoning Adjustment, supra,* 383 A.2d at 11 (cita-

tion omitted). In this case, WSC fails to meet these requirements. In particular, as noted above, WSC did not establish "expensive and permanent improvements" made in reliance on the Zoning Administrator's recomputation of parking requirements. Moreover, estoppel cannot apply because the Zoning Administrator's September 1979, calculations and approval of WSC's applications for certificates of occupancy were subject in any event to BZA review and possible modification. *See Interdonato v. District of Columbia Board of Zoning Adjustment,* 429 A.2d 1000, 1004 (D.C. 1981) (petitioners could not justifiably rely on non-final BZA action still subject to review).

### IV

Two claims of error are asserted in relation to the BZA's consideration of the merits of the parking issue. First, WSC claims in its cross-appeal that the BZA erred in finding that the Wardman Tower contained 60 units in 1958, thereby increasing the number of parking spaces required at the hotel. Second, WPCA claims that the BZA erred in ruling that the WSC was not required under prior BZA Order 6750 to provide 898 parking spaces. We consider these claims of error separately below.

### A.

#### *The Wardman Tower*

The Zoning Regulations require, in general, that one parking space be provided for every two units at a hotel. 11 DCMR § 7202.1 (1977).[28] With several exceptions not relevant here, the regulations exempt buildings built before May 12, 1958—the effective date of the parking regulations— from this requirement. 11 DCMR § 7201.1

---

**28.** The zoning regulations require that one parking space be provided "for each two sleeping rooms or suites." 11 DCMR § 7202.1 (1977). As the Zoning Administrator interprets this regulation, a room that cannot be separately rented (*i.e.,* that does not have a bathroom) is not counted as a "room" for purposes of computing

parking requirements. Thus, a suite could have ten rooms, but if those rooms were rentable only as a group, it would require only one parking space. To avoid confusion, we use the term "unit" to signify a separately rentable sleeping room or suite.

(1977); *see Page Associates v. District of Columbia*, 463 A.2d 649, 651 (D.C.1983).

In applying for certificates of occupancy for the hotel, WSC represented to the Zoning Administrator that the completed structure would contain 1366 units. WSC claimed that no parking spaces were required for the 209-unit Wardman Tower because that structure had been built prior to May 1958. In issuing the certificate of occupancy, the Zoning Administrator accepted this contention, and calculated the parking required based on a total of 1157 units. In its appeal to the BZA, the WPCA claimed that as of May 1958, the Wardman Tower contained only 60 units. WPCA argued, therefore, that in calculating parking requirements, only 60 units should be excluded from the hotel's total of 1366. Thus, the factual question before the BZA was the number of units contained in the Wardman Tower as of May 12, 1958.

■ ■ In reviewing the BZA's findings on this question, we apply the "substantial evidence test." District of Columbia Administrative Procedure Act (DCAPA), D.C.Code § 1–1509(e) (1981).[29] That test requires that in each agency decision (1) there must be findings on each contested issue of fact; (2) the decision must rationally follow from the facts; and (3) there must be sufficient evidence supporting each finding. *Citizens Association of*

*Georgetown, Inc. v. District of Columbia Zoning Commission*, 402 A.2d 36, 41 (D.C. 1979) (citations omitted). To be sufficient to support a finding, evidence must be "more than a mere scintilla [and must be] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *see also Vestry of Grace Parish v. District of Columbia Alcoholic Beverage Control Board*, 366 A.2d 1110, 1112 (D.C.1976).

The evidence presented to the BZA on both sides of this issue was meager. WPCA offered the testimony of Mr. Lindsley Williams, an area resident and former Area Neighborhood Commissioner, who had prepared an application in 1978 to designate the Wardman Tower a historical landmark. Mr. Williams testified that according to his "information and belief" the Wardman Tower "was used entirely as a residential hotel with approximately 60 permanent residential suites until early in the 1960's." [30] The Zoning Administrator testified that he had "no idea" how many rooms were in the Wardman Tower in 1958. He explained that his determination that the Wardman Tower contained 209 units in 1958 was based on plans showing 209 to be the current number, coupled with an inability to locate any evidence that a different number existed in 1958.[31] WSC, owner of

**29.** The DCAPA requires that every agency decision be accompanied by written "[f]indings of fact and conclusions of law ... supported by and in accordance with the reliable, probative, and substantial evidence." D.C.Code § 1–1509(e) (1981).

**30.** In support of his position, Mr. Williams cited a newspaper article which contained the following statement, "Mrs. Irwin ... is one of 60 permanent tenants at the Sheraton Park." WASHINGTON POST, Feb. 6, 1969. This article cannot be used as support for the BZA's finding for two reasons. First, the article was excluded from evidence because it was not filed with the BZA five days prior to the hearing as required by Board rules. Supplemental Rules, 22 DCRR § 2.31 (1972). Second, the article does not meet the requirements of "reliable, probative, and substantial evidence," D.C.Code § 1–1509(e)

(1981); *see General Ry. Signal Co. v. District Unemployment Compensation Bd.*, 354 A.2d 529, 532 (D.C.1976), because it is a human interest feature not purporting to address the situation at the Wardman Tower in 1958, but only in 1969. Moreover, the article did not address the number of units at Wardman Tower, but only the number of tenants.

**31.** In this regard, the Zoning Administrator testified that he conducted an exhaustive search of city records in an attempt to determine the correct number of units in 1958. The Zoning Administrator checked records of the Fire Marshal's Office, the Building Inspector's Office in the Department of Housing and Community Development, the Permit Branch and the License Branch of the Department of Licenses, Investigations and Inspection, and the Assessor's Office in the Department of Finance and Revenue.

the Wardman Tower in 1958, presented no evidence on the issue to the BZA.

The BZA's conclusion that "the most reliable information seems to be that the Wardman Towers had sixty permanent residential units in 1958" based on Mr. Williams' testimony, is bolstered by the fact that the testimony was essentially unrebutted. Given the absence of contrary evidence, the record before the BZA was sparse. Nonetheless, we find the BZA's conclusion that the Wardman Tower contained 60 units in 1958 to be based on substantial evidence. *See Lynchburg Gas Co. v. Federal Power Commission,* 119 U.S.App.D.C. 23, 29, 336 F.2d 942, 948 (1964) (where proof of certain facts is unavailable or such proof as is available is highly speculative, courts give greater deference to agency expertise); *see also Federal Power Commission v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 28–29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *Federal Communications Commission v. RCA Communications,* 346 U.S. 86, 96–97, 73 S.Ct. 998, 1005, 97 L.Ed. 1470 (1953).

### BZA Order 6750

 WPCA claims error in the BZA's ruling that prior BZA Order 6750 (dated December 5, 1962) did not require WSC to provide 898 parking spaces. We find no error in the BZA's ruling on this issue.

In 1962, WSC applied to the BZA for a variance for the Sheraton-Park Hotel.[32] In granting the variance, the BZA issued Order 6750 which contained the following finding of fact:

> (4) A traffic report relating to the proposed addition ... was made part of the

record before the Zoning Commission [in the above cited case]. *This report disclosed that the existing off-street parking spaces totaling 564 will be increased to 898* and that the present hotel rooms, excluding permanent suites, will be increased from 910 to 1100 rooms. [Emphasis added.] [33]

WPCA argued to the BZA that this prior order imposed a requirement on WSC to provide 898 parking spaces at the hotel.[34] This requirement, WPCA claimed, was still in effect.

The BZA rejected WPCA's contention on two grounds, both of which are challenged on appeal by WPCA. First, the BZA found "no legal requirement" in the prior orders to provide a specified number of spaces. The BZA reasoned:

> The Zoning Commission Order rezoned the property, and cannot be read to apply any conditions other than to permit what is allowed and required under R–5–C zoning. The BZA orders are vague, very short and do not specifically require a set number of spaces. In one case, the Order referenced instructions given outside the context of the hearing and not found in writing anywhere.

WPCA now claims that the BZA erred as a matter of law in finding that the prior order imposed no legal requirement as to parking. *See Gordon v. District Unemployment Compensation Board,* 402 A.2d 1251, 1254 (D.C.1979) (court does not defer to agency in reviewing conclusion on matter of law). We disagree.

The section of BZA Order 6750 relied upon by WPCA is found in a finding of fact contained in that order. In testimony to

---

None of these sources yielded any information that shed light on the number of units in Wardman Tower in 1958.

**32.** The variance was from the zoning regulation's setback requirement to permit an addition to the hotel. Also at this time, the BZA approved roof structures proposed for the hotel.

**33.** The variance was made subject to the following conditions:

The building shall be erected substantially in accord with revised plans marked "Exhibit A—William E. Chase" dated December 5, 1962 and filed for the record on that date to comply with verbal instructions issued to the appellant by this Board immediately following the hearing of this case.

**34.** In support, WPCA cited testimony and evidence in the 1962 zoning applications indicating that the hotel would provide 898 parking spaces.

the BZA, the Zoning Administrator stated that the consistent policy of his office is that only statements included as conditions to variances impose legal requirements and are therefore enforceable. The Zoning Administrator explained that because the statement at issue in Order 6750 was contained in a finding of fact, it imposed no legal requirement. This testimony, coupled with the BZA's finding that the language cited in the order was vague, makes clear that the BZA's ruling that Order 6750 imposed no legal requirement as to parking was not in error as a matter of law.

The BZA further found Order 6750 unenforceable because the building to which it applied no longer exists. WPCA challenges this factual finding as not based on substantial evidence. Again, we disagree.

Evidence before the BZA showed that the main portion of the previous hotel building was demolished after construction of the new portion of the hotel. This evidence amply supports the BZA's conclusion that "[e]ven if any requirements had been imposed as a result of the previous orders, those requirements cease to be applicable when the building to which they were attached is demolished." Thus, the BZA's conclusion on this issue was supported by substantial evidence. *See Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission, supra,* 402 A.2d at 41.

Accordingly, as to the issues of height, setback, and accessory use, we reverse the BZA's denial of WSC's motion to dismiss. The BZA's decision on the merits of the parking issue is affirmed.

*So ordered.*