CITIZENS' COALITION AGAINST the PROPOSED BROOKINGS OFFICE BUILDING, Petitioner,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,

The Brookings Institution, Intervenor.

No. 85–841.

District of Columbia Court of Appeals.

Argued May 15, 1986.
Decided Oct. 20, 1986.

Paul J. Kaller, with whom Robert K. Stumberg, Washington, D.C., was on the brief, for petitioner.

Beverly J. Burke, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, at the time the memorandum was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the Memorandum in Lieu of Brief, for respondent.

Michael A. Cain, with whom Cynthia A. Giordano, Silver Spring, Md., and Robert C. Jenkins, Washington, D.C., were on the

brief, for intervenor The Brookings Institution.

Before PRYOR, Chief Judge, and BELSON and ROGERS, Associate Judges.

BELSON, Associate Judge:

Petitioner, Citizens' Coalition Against the Proposed Brookings Office Building, seeks review of an order of the District of Columbia Zoning Commission approving a mixed office and residential project adjacent to the Brookings Institution's headquarters at 1775 Massachusetts Avenue, N.W., on lot 113 in square 157. Petitioner contends, *inter alia*, that the project as ultimately approved failed to conform to the terms of the Commission's preliminary approval, and therefore the Commission's final approval should be reversed. We affirm.

Brookings originally sought Zoning Commission approval of a one-stage Planned Unit Development (PUD) and a related zoning map amendment. The proposal was for a mixed office and residential project. Following public hearings, the Commission gave its preliminary approval in Order Number 413, November 21, 1983, but required that a variety of changes be made in the project to enhance compatibility with the project's residential environs, particularly on the P Street side, before final approval would be considered at a second stage of the proceedings. On September 24, 1984, Brookings submitted its revised project plans for final PUD approval, together with an application for rezoning. Following public hearings, the Commission granted final approval of the PUD and related rezoning in Order Number 457, issued on May 13, 1985. Petitioner, which had participated in both phases of the proceedings, moved for reconsideration. Following the Commission's denial of that motion, petitioner sought review of Order 457 by this court. Brookings intervened.

## I

Petitioner contends that the PUD ultimately approved did not comply with the Commission's first stage order in three respects. First, petitioner argues that Condition 1 of the first stage order was not satisfied. Condition 1, in its entirety, reads as follows:

> The project shall be developed under the R-5-D and/or SP-2 Districts. The applicant shall submit with the second stage application an application for rezoning from R-5-D to SP-2 for as much of the property as is necessary to support the project.[1]

The Commission found that Brookings' second stage application met Condition 1:

> The second-stage application includes an application for rezoning 21,668 square feet of the 24,088 square feet of land in Lot 113 which is presently zoned R-5-D to SP-2.[2] This amount of rezoning is necessary to support the project. The remaining 2,420 square feet of the land which is presently zoned R-5-D will not be rezoned leaving a 10-foot-wide strip of R-5-D zoned land at the P Street project frontage.

Zoning Commission Order No. 457, Finding 19A (May 13, 1985). Although this issue was vigorously contested, we are satisfied that there is substantial evidence in the record within the meaning of D.C. Code § 1-1510(a)(3)(E) .(1981) to support the Commission's finding.

There is no dispute that Condition 5 of the first stage order mandated "[t]hat the maximum floor area ratios (FAR) for the entire project shall not exceed 6.0," and that "[t]he maximum nonresidential FAR shall not exceed 3.8." Project architect

1. R-5-D is a high density residential zoning classification. SP-2 is a mixed use zoning classification that permits all residential uses and, with approval of the Board of Zoning Adjustment, office use by professionals and non-profit organizations, as well as other limited commercial uses.

2. Lot 113 was already split-zoned. Over three-fifths of Lot 113, 38,538 square feet, was zoned SP-2 before this project was proposed.

Philip Esocoff, who was qualified as an expert in architecture and planning, testified that in order to stay within the 3.8 FAR maximum, given the amount of office space square footage the second stage Brookings proposal entailed, all but 2,420 square feet of lot 113 had to be zoned SP–2. Petitioner does not challenge the Commission's acceptance of this reasoning, but attacks the starting point from which Esocoff reasoned. Specifically, petitioner questions whether there was substantial evidence in the record to support the premise that the office component of the project had to be as large as proposed.

Brookings called two witnesses who testified regarding the financial feasibility of the project. Project manager David Richards, who was qualified as an expert in real estate development, told the Commission that, in response to the first stage order, 11,317 square feet of office space had been replaced by less profitable residential space. Specifically, the office building was moved back from P Street an average of twenty feet, and three townhouses were placed in front of the office building. Richards asserted that "the projected financial return has been reduced to the lowest acceptable level when considered against alternative investments that are available." Richards declined to specify how he arrived at this conclusion, for fear of disclosing "proprietary information."

According to Richards, Brookings commissioned William Harps, an economic consultant and appraiser, to review Richards' financial analysis and make an independent assessment of the second stage proposal's economic viability. Harps, also testifying as an expert, explained in considerable detail how he analyzed the Brookings plan. After researching market rents from the neighborhood for SP and regular office space, and collecting expense data on 41 office buildings, Harps estimated fair market rent and expenses for the proposed space. Subtracting the latter from the former, Harps arrived at an estimated net rent. After factoring in the cost of a loan to finance the project, based on interest rates and other figures petitioner does not challenge here, Harps concluded that the project would yield a 7.4% annual return on equity. Harps viewed this rate of return as "marginal but possible," and suggested that only because Brookings would be a partial owner and user of the space would Brookings be justified in accepting so low a rate of return. Harps noted that, at the time, one could purchase nontaxable AA and A bonds paying 9.5% and 10.2%, respectively.

While petitioner is correct to point out that Brookings never disclosed the minimum rate of return it would accept, we do not regard this fact as dispositive. The Commission heard from one expert, Richards, who stated that his analysis led him to conclude that the proposal called for only the minimum amount of office space to make the project economically viable. The Commission heard a second expert, Harps, whose testimony lent support to Richards' testimony by describing how he independently arrived at the conclusion that the proposal was cutting it close financially. Yet another expert, Esocoff, linked the space provisions of the proposal with the need to comply with the floor area ratios of Condition 5.

■ Our task on review would have been easier had Brookings been more forthcoming in furnishing the facts and assumptions which underlay its contention that its second stage proposal called for the rezoning of only as much property as necessary to support the project. The Commission, moreover, could have eased our task by elaborating upon its finding that Brookings had complied with Condition 1. We are convinced, however, that the Commission's finding is supported by substantial evidence in the record. The testimony of three expert witnesses, albeit in varying degrees of detail, supported the Commission's finding. As long as there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, the finding withstands substantial

evidence review. *Woodley Park Community Association v. District of Columbia Board of Zoning Adjustment*, 490 A.2d 628, 640 (D.C.1985). This observation is particularly apt where, as here, no rebuttal testimony relevant to the Commission's finding was introduced. *See id.* at 640–41 (the only record evidence regarding number of building units was the "essentially unrebutted" testimony of a single witness, who testified according to information and belief; Board of Zoning Appeals' conclusion, supported only by that testimony, upheld as based on substantial evidence).[3]

## II

Petitioner asserts that the approved PUD did not conform to Condition 4 of the stage one Commission order. Condition 4 required that "[a]ll areas of the building which front on P Street, N.W., shall be devoted to residential use." The approved plan calls for three townhouses to be situated between the P Street property line and the office building, which will be set back 16 to 22 feet from the property line. Petitioner objects to the approved plan on the ground that, while all parts of the project *touching* the P Street property line are residential in character, the office building component of the project will be *visible* from P Street and so near to P Street as to detract from its residential character. According to petitioner, this means that not all areas of the building which "front on" P Street are residential. The Commission found that the approved plan satisfied Condition 4 because "[a]t the P Street property line, the proposed project includes an apartment house and residential townhouses providing an unbroken residential streetscape from the National Trust to 17th Street."

Petitioner's challenge on this point boils down to a contention that the Commission's use of the term "front on" in Condition 4 meant so situated as to detract from the residential character of P Street. The Commission responded to this contention in its final order, offering the following concerning its use of the term "front" in the first order:

All of the portions of the building which directly and immediately touch on the street are devoted to residential uses. The Commission notes that the word "front" in Condition No. 4 of Order No. 413 was one of a number of words that the Commission used in the original discussion of this matter. The Commission did not intend to distinguish "front" from "face," "abut" or "on," and the various legal memoranda to that effect attempt to create a distinction where none was intended. The Commission does note the definition in the Zoning Regulations of "street frontage" as "the property line where a lot abuts upon a street."

---

**3.** Petitioner contends that, even if the amount of rezoning proposed in Brookings' second stage application complied with the terms of the first stage order, the rezoning was so extensive as to be inconsistent with the District of Columbia comprehensive plan, as amended between the time when the first stage order was issued and Brookings submitted its second stage proposal. This amendment designated the relevant Massachusetts Avenue area for predominantly high density residential uses. Even assuming that the amended comprehensive plan controls, petitioner's contention lacks merit. The National Capitol Planning Commission found that the proposed rezoning would be consistent with the amended comprehensive plan, noting that "[t]he slight increase of office use over residential use contained in this mixed-use development would not alter the predominance of residential uses in the immediate area." We find no basis for overturning the Commission's conclusion of law that the application is not inconsistent with comprehensive plan.

Petitioner also contends that the 10–foot-wide strip of R–5–D zoning retained along the P Street property line constitutes illegal spot zoning. In *Citizens Association of Georgetown v. District of Columbia Zoning Commission,* 402 A.2d 36, 39–40 (D.C.1979), we held that "[t]o constitute illegal spot zoning, the Commission's action ... must be inconsistent with the city's comprehensive plan, or if there is none, with the character and zoning of the surrounding area, or the purposes of zoning regulation, i.e., the public health, safety, and general welfare." (Citations omitted.) We find petitioner's argument unpersuasive.

Commission Order No. 457, Finding 28C (May 13, 1985). For the reasons elaborated below, the Commission's explanation of what it meant in imposing Condition 4 is persuasive.

In the first place, the Commission is in the best position to know what it meant when it used the term "front" in the portion of its order that dealt with the residential character of P Street. Moreover, the Commission's interpretation of its own order is entitled to great deference. *See Dupont Circle Citizens Association v. District of Columbia Zoning Commission*, 431 A.2d 560, 565 (D.C.1981) (Commission's interpretation of its own procedural rules entitled to deference even more than its interpretations of zoning regulations). We also observe that the first stage order, as the Commission's explanation indicates, did not use the term "front" in every place where the term might have been used. For example, in Finding 48 of the first stage order, the Commission stated that nonresidential office uses should not be introduced *"on* P Street," while in Finding 51 the Commission stressed it favored developing "the P Street *frontage* with residential uses." (Emphasis added.) Furthermore, the Commission correctly points out that municipal zoning regulations define the term "street frontage" as "the property line where a lot *abuts* upon a street." 11 District of Columbia Municipal Regulations (DCMR) § 199, at 1–24 (1985) (emphasis added). We also observe that the opinion of the United States Court of Appeals in *Stanley Company of America v. Tobriner*, 111 U.S.App.D.C. 404, 298 F.2d 318 (1961), upon which petitioner relies, notes that "[d]ifferent meanings are attributable to the verb 'front'", and acknowledges that some opinions use the word "somewhat synonymously with

'abuts.'" *Id.* at 407, 298 F.2d at 321. In sum, the Commission's position that it intended only that Condition 4 bar nonresidential development *on* the P Street property line is consistent with its own word choice in the stage one order, zoning regulations, and case law.

■ We add that the Commission concerned itself in its second stage order with more than a discussion of the meaning of the term "front." It also sought to preserve the residential character of the 1700 block of P Street by imposing certain specific requirements for that purpose.[4] In consideration of the entire record, therefore, we cannot say that the Commission erred in its application of the requirement of its first stage order that "all areas of the building which front on P Street, N.W., shall be devoted to residential use."

### III

Condition 7 of the first stage order, which refers to height limitations on the project, is also a source of contention between the parties. The condition provides:

The maximum height of the new building shall not exceed sixty-nine feet at the Massachusetts Avenue property line. The height of the building shall not exceed sixty-seven feet at the P Street property line. The maximum height for the project shall not exceed ninety feet, exclusive of roof structures. Additional setback and height variations shall be provided generally as shown on the plans marked as Exhibit No. 87 of the record.

Zoning Commission Order No. 413, Condition 7 (November 21, 1983). The Commission found that Condition 7 was satisfied. It observed that "[t]he height of the proposed apartment house at the P Street

---

4. *The Commission's Finding 28D states as follows:*

To the extent that portions of the office building may be visible from P Street, the Commission will impose a number of conditions on the final approval to maintain a more residential character to the P Street side of the project. No fluorescent fixtures or venetian blinds will be permitted on north facing windows. Further, the height of the townhouse portion of the residential units will be increased by one story, to reinforce the townhouse scale of those units and to more closely duplicate the character of the houses on the north side of P Street.

property line is *an average of* sixty-seven feet." (Emphasis added.) Moreover, the Commission emphasized that:

> Condition No. 7, which specifies the maximum permitted height, specifically requires variations in the permitted height, as reflected on a specified set of plans from the record in Case No. 82–13C. Comparison of the presented proposed plans with the earlier plans, which were presented side-by-side at the public hearing, reveals no significant changes as to height. The present application is consistent with the prior approval.

Even though petitioner does not dispute that the average height of the proposed apartment building on the P Street property line is about sixty-seven feet, petitioner contends that the project violates the first stage order because at some points the height is as much at eighty-nine feet. Our task in reviewing the Commission's conclusion that Condition 7 was satisfied is to determine whether or not it is supported by substantial evidence in the record. The Commission's conclusion withstands this standard of review for several reasons. The first and the third sentences in the excerpt from the Commission's first stage order quoted above explicitly refer to "maximum height." The second sentence, which the Commission interprets to refer to average height and petitioner insists refers to maximum height, refers only to "height." The omission of the word "maximum" from the second sentence of Condition 7 is fully consistent with the Commission's treatment of the condition as referring to average height.

■ The Commission's finding of compliance with Condition 7 of the first stage order is supported by the fact that Condition 7 explicitly authorizes "height varia-

tions" in accord with Exhibit 87 of the record. We have examined this exhibit, and it clearly shows that at certain points on the P Street property line, the building height would reach approximately eighty-nine feet. Petitioner concedes that the approved project is consistent with Exhibit 87, but argues that Condition 7 implied that only those height variations in Exhibit 87 which would not exceed sixty-seven feet were sanctioned by the Commission. We decline to accept such a strained reading of Condition 7, particularly where the Commission advances a reasonable alternative construction of the condition it imposed.[5] Accordingly, we hold that there is substantial evidence in the record to uphold the Commission's ruling that the approved project conformed to the height limitations outlined in Condition 7.

## IV

There are two procedural issues petitioner raises that merit brief discussion. Petitioner complains that it was denied a fair hearing because it was denied an opportunity to cross-examine Brookings' rebuttal witnesses. A party in a contested case is entitled "to conduct such cross-examination as may be required for a full and true disclosure of the facts." D.C.Code § 1–1509(b) (1981).

■ Assuming *arguendo* that the Commission erred in refusing to allow petitioner to cross-examine Brookings' rebuttal witness, we note that petitioner's counsel never requested an opportunity to proffer what facts he hoped to elicit through cross-examination, nor has petitioner ever established how it was prejudiced. It is clear, moreover, that petitioner had a full opportunity to present its case, and to cross-examine during Brookings' initial presenta-

---

5. The circumstances here are not comparable to those in *Citizens Association of Georgetown v. D.C. Board of Zoning Adjustment,* 365 A.2d 372 (D.C.1976), upon which petitioner relies. There, over three months after the issuance of an apparently final order, the Board issued what it termed an "interpretation" of that order that, in our words, "amounted to a substantial modifica-

tion" in accord with Exhibit 87 of the record.tion of the original order." *Id.* at 377. The interpretation was issued in response to an inquiry by the applicant without affording other parties notice or an opportunity to be heard. Here, by contrast, we find the Commission's final order fully consistent with its reasonable interpretation of its preliminary order.

tion and the presentation of the Office of Planning. Under the circumstances, we harbor no "substantial doubt ... whether the agency would have made the same ultimate finding with the error removed." *Arthur v. District of Columbia Nurses' Examining Board*, 459 A.2d 141, 146 (D.C. 1983). Consequently, any error was nonprejudicial. *Id.*

■ Petitioner assails the Commission for allowing the Office of Planning to present testimony on behalf of the project, and later to summarize all of the parties' positions for the Commission. In *Capitol Hill Restoration Society v. Zoning Commission*, 380 A.2d 174, 180–81 (D.C.1977), *overruled on other grounds, Citizens Association of Georgetown v. Zoning Commission of the District of Columbia*, 392 A.2d 1027, 1036 (D.C.1978), this court confronted an identical fact pattern, with the additional aggravating fact that the meeting between the Office of Planning and the Commission was closed to the public. Although we expressed misgivings about the procedure there, as we do once more regarding the less offensive circumstances of this case, we found no violation of due process or of the District of Columbia Administrative Procedure Act.

Neither the substantive nor the procedural challenges petitioner mounts in this appeal justify reversal. The Commission's findings of fact and conclusions of law are supported by the record and are in accordance with law. We decline to substitute our judgment for that of the Commission. *Rock Creek East Neighborhood League, Inc. v. District of Columbia Zoning Commission*, 388 A.2d 450, 451 (D.C.1978).

*Affirmed.*