PAGE ASSOCIATES, et al., Appellants,

v.

DISTRICT OF COLUMBIA, et
al., Appellees.

PAGE ASSOCIATES, et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF
ZONING ADJUSTMENT, Respondent.

The Chastleton Tenants Association,
Intervenor.

Nos. 81–990, 81–1235.

District of Columbia Court of Appeals.

Argued June 8, 1982.

Decided May 27, 1983.

William Daniel Sullivan, Washington, D.C., for appellants-petitioners.

Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellees-respondent. David Bonderman, Washington, D.C., also entered an appearance for appellee, John Wilson.

Andrew F. Martin, Washington, D.C., for intervenor.

Before NEBEKER, MACK and PRYOR, Associate Judges.

MACK, Associate Judge:

## I

In these requests for review of a decision of the Board of Zoning Adjustment (BZA) and the trial court's denial of summary judgment, we are presented with a controversy growing out of refusal by zoning authorities to permit appellants-petitioners to convert apartment house units into hotel units. Specifically, the issue is whether such conversion is prohibited by the enactment, in 1979 and 1980, of emergency orders and permanent amendments to zoning regulations. *See* 20 D.C. Zoning Regs. § 3105.34 (1958 as amended).[1] Page Associates (appellants) maintain that they are insulated from the prohibitions by virtue of a "grandfathering" provision of the zoning regulations, § 8104.7, which provides that acceptable application for Certificates of Occupancy, filed before the effective date of regulations, may be processed in accord with regulations in effect at the time the applications were filed. We agree.

Although in our view these appeals present a relatively simple legal issue of regulatory interpretation[2]—one revolving around a pivotal date of August 9, 1979—the history of the submission or renewal of applications by appellants to the zoning authorities, coupled with the handling of those applications, prompts us to present detailed facts in the interest of comprehending at least why there is a dispute.

In November 1978, appellants contracted to purchase two contiguous parcels of property: one was improved by a 315-unit structure (the Chastleton); the other was unimproved and consisted of several lots. The Chastleton had been operated as a hotel from 1927–1967 and was then converted into an apartment building. Appellants, at the time of the contract of purchase in 1978, intended to reconvert the Chastleton to a hotel as the units became vacant and paid the then-owner to keep apartments vacant as they emptied during the presettlement period. In January 1979, the owner, Columbia Realty Venture, filed an application for a Hotel Certificate of Occupancy for the entire 315-unit building and on March 1, 1979, applied for a Certificate of Occupancy to use the 41 rooms which were vacant as hotel units. Both of these applications

---

1. As of July 1982, the zoning regulations were recodified in Title 11 of the District of Columbia Municipal Regulations (D.C.M.R.).

2. In view of the fact that our conclusion that appellants' application was "grandfathered" irrespective of the question of validity of the emergency orders issued by the Zoning Commission, we do not address that issue of validity.

were disapproved by the Zoning Administrator because parking spaces were not provided as required by § 7202.1.

The zoning regulations mandate that parking spaces for apartment buildings be provided in a ratio of one parking space for every three units and for hotels in a ratio of one space for every two units. *Id.* The zoning regulations provide, however, that a building, like the Chastleton, which was built before the regulations required parking, can continue to operate without providing parking. D.C. Zoning Regs. § 7201.1.[3] However, if the building is converted, parking spaces must be provided in the amount not already grandfathered. D.C. Zoning Regs. § 7201.2.

■ If operated as an apartment building, the Chastleton would ordinarily require 105 spaces for the 315-units, (one space for every three units). Because the structure was built before the regulations required parking the building was grandfathered for 105 spaces. As a hotel, the Chastleton would require 158 parking spaces (one space for every two units). Thus, in order to reconvert the Chastleton into a hotel, the owner (grandfathered for 105 spaces) was required to provide only fifty-three parking spaces.

In a series of orders by the Board of Zoning Adjustment, the last on November 23, 1977, the unimproved lot adjacent to the Chastleton had been approved by the Board for 49 parking spaces. However, appellants, wishing to use the adjacent lot for other purposes, did not want to incorporate more of the adjacent lot into the conversion application than was necessary.

In order to provide parking for the 41-unit application, appellant needed to provide seven parking spaces. Following the disapproval of the 41-unit application, appellants' counsel, Mr. Norman Glasgow, Jr., conferred with the Zoning Administrator, Mr. James Fahey, regarding possible means of providing the required parking on the adjacent lot. The option of incorporating the entire lot all at one time was rejected since, unless all 49 spaces could be used immediately, such action would reduce the amount of parking grandfathered for apartment use. The owners, therefore, wished to incorporate only as much of the adjacent lot as was necessary for a particular submission of an application for a Hotel Certificate of Occupancy.

On March 23, 1979, Mr. Glasgow, Jr., wrote to Mr. Steve Sher (Executive Director of the BZA) and to Mr. Fahey expressing appellants' intention to use the adjacent lot to provide the parking spaces required for the 41-unit application; a copy of BZA orders which approved the lot for use as accessory parking as well as a copy of the parking plan were forwarded therewith. Mr. Sher then contacted the Acting Corporation Counsel for the District of Columbia to determine whether use of this accessory parking plan was permissible; the Corporation Counsel responded that appellants, as a matter of right, could incorporate any or all of the parking spaces on the adjacent lot into the improved lot to provide the required parking spaces. Accordingly, land from the adjacent lot, sufficient to provide the seven spaces for the 41-unit application, was incorporated into the Chastleton property and a driveway easement, to provide access to the parking spaces, was recorded. On May 10, 1979, a Certificate of Occupancy for the 41 hotel units was received by Columbia Realty Venture and reissued to appellants on June 26 after the purchase of the properties.

---

3. D.C.Code § 5–423 (1981) [previously codified at § 5–419 (1973)] provides, in pertinent part: The lawful use of a building or premises as existing and lawful at the time of the original adoption of any regulation heretofore adopted ... at the time of such adoption, may be continued although such use does not conform with the provisions of such regulation.

... The Zoning Commission may in its discretion provide upon such terms and conditions as may be set forth in the regulations for the extension of any such nonconforming use ....

On August 1, 1979, appellants applied for a blanket Certificate of Occupancy for 268 hotel units. This application required 44 parking spaces, including the seven spaces already incorporated and approved. This application was stamped "Complies with Zoning Regulations." Although the 49-space parking plan was already filed with the Zoning Administrator, appellants submitted a plan for a 34-parking space underground garage beneath the Chastleton because appellants were still exploring alternatives to using the adjacent lot for parking. These 34 spaces, coupled with the seven already incorporated from the adjacent lot, provided only 41 spaces, three shy of the total required for the 268-unit application. On August 1, appellants also submitted a partial application for a second group of 41 units which were not vacant and ready for conversion.

The 34-space underground garage was not accepted for filing because, according to Mr. Joseph Bottner, Chief of the Zoning Review Branch of the Department of Licenses, Investigations and Inspections, *some* of the spaces failed to meet the zoning regulations; no mention was made as to the number of spaces provided being inadequate. Appellants deleted ten spaces from the plans (those which Mr. Bottner indicated were technically deficient) and submitted this altered plan for a 24-space garage.

The 24 spaces from the underground garage and the seven spaces already incorporated from the adjacent lot provided only 31 of the 44 spaces required for the 268-unit application. In order to decrease the total number of spaces required, appellants amended the blanket application for a Certificate of Occupancy from 268 units to 254 units thereby decreasing the required number of parking spaces from 44 to 41. This amended application was filed on August 7, 1979, and stamped "Complies with Zoning Regulations."

On August 9, 1979, the amended plan for the 24-space underground garage was filed, along with an application for a building permit to construct the garage.[4] These documents were stamped "Accepted for Filing" and approved for zoning. If this underground garage plan were followed, appellants would be required to provide only an additional ten parking spaces for the 254-unit application.

As of August 9, the pivotal date in this controversy, the appellants' applications and plans had been accepted for filing. Mr. Glasgow, Jr., was surprised to later learn that the applications had been stamped "Complies with Zoning Regulations." This stamp meant that the certificate applied for could issue; yet a Certificate of Occupancy could issue only after inspections were made to insure compliance with the zoning regulations. It is clear, therefore, that the applications were erroneously stamped. Since applications which are not sufficiently complete to permit processing are immediately rejected by the Office of the Zoning Administrator, it is clear that appellants' applications, which were not rejected, should have been stamped "Accepted for Filing." According to Mr. Fahey if an application is stamped "Accepted for Filing" it indicates that all necessary documents have been presented and the application for the Certificate of Occupancy is complete in all *"substantial"* aspects.

Thereafter, appellants provided the parking spaces required for the application for the second group of 41 units, which had been filed on August 1, in the same manner that had been followed for the first 41-unit application; land was incorporated from the adjacent lot, and a driveway easement to provide access to the parking was recorded. Thus, on October 11, 1979, a Certificate of Occupancy was issued for the second 41 units; 82 of the 254 units were now certified.

---

4. A building permit is required before structural changes may be made in buildings or land. D.C.Code § 5–426 (1981). An application for a building permit must be accompanied by a detailed scale drawing showing specific information. D.C. Zoning Regs. § 8103.2.

By November, appellant had devised a plan by which 41 parking spaces could be located in an underground garage, thus eliminating the necessity for the use of any additional land from the adjacent lot for Chastleton parking. On November 7, this new plan was filed as a substitute for the 24-space plan (which had been filed in August) and was accepted and processed as a substitute, not as a new, filing. Mr. Glasgow, Jr. made a written note on the plans that appellants contemplated that all of the required 41 parking spaces would be provided in the underground garage if the garage were built. Bottner told Glasgow that there was "no problem" with this substitution. In December, appellants applied for a new building permit to construct this 41-space underground garage and the permit was issued on January 18, 1980.

On March 7, 1980, appellants applied for a Certificate of Occupancy for 50 additional units. This application was not issued a filing number and was withheld from processing.

## II

In the meantime, the Zoning Commission, concerned that the Washington Hilton Hotel was negotiating to acquire three apartment houses in its District (R–5–C)[5] for hotel expansion purposes, issued an emergency order, on August 9, 1979, prohibiting the razing or conversion of residential structures for hotel expansion. Emergency Order No. 291 revising D.C. Zoning Regs. § 3105.34. After further analyses, public hearings, and ultimate referral to the National Capital Planning Commission for review and comment,[6] a second emergency order in January 1980[7] and an order effecting permanent amendment in May 1980, provided respectively that "the size of the hotel may not be expanded" and "the gross floor area of the hotel may not be increased and the total area within the hotel devoted to function rooms, exhibit space and commercial adjuncts may not be increased." See 27 DCR 95, 96 (Jan. 4, 1980); 27 DCR 2066, 2126 (May 8, 1980).[8]

Thereafter, on April 11, 1980, D.C. Councilman Wilson wrote to Mr. Bottner, Chief of the Zoning Review Branch of the Department of Licenses requesting that the Board reconsider the issuance to appellants of the October 1978 certificate for 41 units and reject the March 1980 application for 50 units. In a letter of April 17, 1980, the Chairman of ANC–2B, Mr. William Middleton, made a similar request.

On May 23, 28 and 29, 1980, Mr. Bottner and Mr. Lenwood Graham, Assistant Chief of the Permit Branch of the Department of Licenses, Investigations and Inspections, acting on behalf of the Zoning Administrator, cancelled the application for the 254-unit Certificate of Occupancy, revoked the October 1979 Certificate of Occupancy for 41 units, disapproved the March 1980 application for 50 units and revoked the January 1980 building permit for the underground garage. Bottner stated that the grounds for this action' were that no evidence of parking plans was submitted for the 254-unit application and the 49 spaces on the adjacent lot were not shown on the plans

---

5. The Chastleton is likewise located in an R–5–C District—that is a "medium high density," "general residence" district. See D.C. Zoning Regs. § 2101.

6. See D.C.Code § 5–417(a) (1981).

7. See also Order No. 309, 27 DCR 1408 (April 4, 1980) renewing the text of the second emergency order.

8. D.C. Zoning Regs. § 3105.3 (codified at 11 D.C.M.R. § 3105.3) presently reads:
   The following uses are permitted as a matter of right
       \*    \*    \*    \*    \*    \*

3105.34 Hotel, only in R–5–B, R–5–C or R–5–D Districts, in existence as of May 16, 1980 with a valid Certificate of Occupancy, or a valid application for a building permit, provided that the *gross floor area* of the *hotel* may not be increased and the total area within the *hotel* devoted to *function rooms, exhibit space,* and *commercial adjuncts* may not be increased. Any such existing *hotel* may be repaired, renovated, remodelled or structurally altered.

filed with the Zoning Administrator other than on the Board approved parking plan. Bottner reasoned that the 254-unit application was not complete, was not grandfathered under zoning regulation § 8104.7 and therefore neither the October 1979 nor March 1980 application could be grandfathered.

Appellants filed for temporary, preliminary and permanent injunctive and declaratory relief in Superior Court and filed an appeal with the Board of Zoning Adjustment.[9] The trial court granted preliminary injunctive relief and appellants then moved for summary declaratory and injunctive relief. On March 4, 1981, the Board affirmed the Zoning Administrator's decision and determined that appellant had not filed sufficient information by August 9, 1979, to trigger any grandfathering provisions. The trial court thereafter denied the pending motion for summary relief. We are now presented with a consolidated purported appeal from the trial court's order and a review of the order of the Board.

### III

In our view, the single issue presented is whether the provisions of § 8104.7, correctly interpreted, have the effect of "grandfathering" appellants' application for conversion as of August 9, 1979. If the question is answered affirmatively, the emergency order enacted on that date (and successively re-enacted twice thereafter) did not apply to appellants and the revocation and rejection of the permits and applications were improper.

Section 8104.7 of the Building Regulations provides that

All applications for certificates of occupancy filed before the effective date of these regulations may be processed and any occupancy authorized thereby may be established in accordance with the zoning regulations in effect on the date such applications are filed, provided:

8104.71 The applications are accompanied by information *sufficiently complete to permit processing without substantial change or deviation* .... [Emphasis supplied.]

Appellants maintain that, as of August 9, the Zoning Administrator had sufficient information to permit the applications to be processed without substantial change or deviation. Specifically, they contend that because the 254-unit blanket application and 41-unit partial application had been accepted for filing by the Zoning Administrator, coupled with the fact that the Zoning Administrator knew that the 49-space Board approved adjacent lot was available to provide parking, the conditions imposed by § 8104.7 were met and this grandfathering provision was operative as to the Chastleton.

Appellees maintain, however, that the parking plans submitted with the applications provided insufficient information to permit processing without substantial change or deviation; that appellants never informed the zoning officials that they intended to incorporate space from the adjoining lot; that the mere existence of the lot and the "casual conversations" regarding the 49-space plan were not enough to draw the Zoning Administrator's attention to the plan; and that "something more is required of the applicant than assuming that the Zoning Administrator has knowledge of his entire file. The applicant must in some way call the Zoning Administrator's attention to those items he wants considered, when he files his application."

We have reviewed the regulations, together with the extensive record in this case, and have determined that the Board's conclusion that appellants did not meet the requirements of § 8104.7 was erroneous.

■ Our conclusion is buttressed by the plain language of § 8104.7. This language speaks in terms of filing provided the infor-

---

9. Appeals to the Board of Zoning Adjustment from decisions "granting or refusing a building permit or granting or withholding a certificate of occupancy" is authorized under D.C.Code § 5–424(f) (1981).

mation is sufficiently complete to permit processing "without substantial change or deviation." Our conclusion is further buttressed by evidence of the accepted practices of the Zoning Administrator. According to Mr. Fahey's own testimony during the BZA hearing, when an application for a Certificate of Occupancy is accepted for filing it serves as the Zoning Administrator's certification that he has all the necessary documents and that the application is substantially complete. In this case, when appellants submitted the application for the 254 units, it was stamped "Complies with Zoning Regulations." However, both parties agree that this was an error and agree the application should have been stamped "Accepted for Filing." In practice, such a stamp on an application has certified that there was sufficient documentation to permit processing, and thus to meet the operative condition for the § 8104.7 grandfathering provision.

Moreover, the record in this case alone lends additional support to our interpretations of what is sufficient information for acceptable filing. It refutes the belated claim of the Zoning Administrator that he did not have sufficient information to permit the application to be processed. Appellants had filed a copy of the Board approved 49-space parking plan in March 1979. Appellants' counsel and the Zoning Administrator discussed the possibility of using this lot to provide the requisite parking for the Chastleton. The Zoning Administrator had even solicited and received a written opinion from the Corporation Counsel on this precise issue. It was clear that Mr. Fahey knew appellant could use any number of spaces from the adjoining lot to provide the parking spaces. In fact, appellants had already invoked this option in May 1979 when the Certificate of Occupancy was received for the first 41-unit application with the incorporation of seven spaces from the adjacent lot. It is clear also that the administrator knew of the optional plan for an underground garage, and that at the critical date when the application was accepted for filing, only 10 parking spaces

remained to be accounted for if appellants chose to use the option of the garage.

The behavior of the Zoning Administrator subsequent to August 9 also is consistent with the fact that he knew, or should have known, he had sufficient information to process the application. A Certificate of Occupancy for the second 41-units was issued in October 1979. As with the first 41-units, parking for this application was provided by incorporating land from the adjacent lot and recording an easement to provide access to the parking. We fail to understand how sufficient information was available to process the second 41-unit application but insufficient information was available to process the 254-unit application when both applications relied on the identical data.

In support of its conclusion, the Board relies on the fact that appellants never made a final decision as to the precise sites of the parking spaces and therefore, the 254-unit application could not be grandfathered. While it is true that appellants would have to designate the particular parking spaces to be incorporated and file an easement prior to the issuance of a Certificate of Occupancy, this decision was not required to permit the processing of the application. There was no question that sufficient parking was available and could be provided to meet the zoning regulation requirement. The availability of appellants' options regarding which parking plan to use had been repeatedly sanctioned and the failure to exercise this choice at this stage in no way amounted to a failure to provide "sufficient information to permit processing without substantial change or deviation."

We recognize that the Zoning Commission is charged with promulgating regulations that primarily it is the responsibility of the Board of Zoning Adjustment to interpret such regulations—an interpretation to which we give deference unless such interpretation is clearly erroneous or inconsistent with the regulations. *Keefe Co. v.*

*District of Columbia Board of Zoning Adjustment,* 409 A.2d 624, 625–26 (D.C.1979).

However, we read the Board's interpretation in this case to be so restrictive as to undermine the rationale of the "grandfathering" provision of § 8104.71. If that provision does not operate here to permit appellants' applications to be processed and carried to completion under regulations in effect at the time of filing, it is difficult to imagine circumstances where that provision would have meaning. Significantly, here the Zoning Administrator found it necessary to "cancel" applications and "revoke" Certificates of Occupancy of a "master" application.

"Grandfathering," by its very nature, operates to vest a right as of a time certain, by operation of law. To accept the Board's interpretation would make it possible for the Board to act after the fact to divest a party of a vested right by exalting form over substance. The Commission has provided generally, that applications for occupancy conversion may be grandfathered when accompanied by information "sufficiently" complete to permit processing without "substantial" change or deviation. It has not detailed specific information essential for such a purpose. Compare § 8103.51, *infra,* note 10.

■ We therefore reject appellees' argument that equates the "sufficiently complete information" required for grandfathering processing for occupancy conversion under § 8104.71 which the detailed plans *specifically* required (and incorporated by reference) for grandfathering applications for building permits pursuant to § 8103.5.[10]

Our conclusion is consistent with Judge Stewart's reasoning presented in his Find-

ings of Fact, Conclusions of Law and Order Granting Preliminary Injunction on August 11, 1980. It states in part:

Defendants argue, and plaintiffs admit, that the underground parking plans filed on August 9, 1979 did not show a sufficient number of parking spaces for the 254 unit hotel application. But it is undisputed as well that those of the defendants charged with determining compliance with the zoning regulations knew that plaintiffs had the right to use surface parking on the adjacent lot to provide the parking spaces required for conversion of these units to hotel use. This was the manner in which the required parking was provided for the first 41-unit hotel application pursuant to the opinion of the Corporation Counsel, and all of this was known to defendants Bottner and Fahey prior to August 9, 1979. It was therefore immaterial that plaintiffs did not file an underground parking garage plan for all of the parking that would be required for conversion of the 254 units to hotel use. The immateriality of the number of spaces shown on the underground parking plans filed on August 9 was aptly demonstrated by three factors. First, defendant Bottner's criticism of the parking plans submitted on August 1, 1979 made no mention of any deficiency in the number of parking spaces to be provided for the 254 unit conversion. Each of the deficiencies noted was corrected upon the plans submitted on August 9, 1979. Second, each of the applications were certified as complying with the zoning regulations when filed. Third, the August 1 application for the second 41 unit hotel certificate on occupancy was processed not upon the basis of any proposed use of underground parking, but on

10. Section 8103.5 reads:

8103.5 All applications for building permits filed before the effective date of these regulations may be processed and any work to be authorized thereby may be carried to completion in accordance with the zoning regulations in effect on the date such applications are filed, provided:

8103.51 Such applications are accompanied by the plans and other information required

by Sub-section 8103.2 sufficiently complete to permit processing without substantial change or deviation.

8103.52 Any approved building permit shall be taken out within six months after the effective date of these regulations, and,

8103.53 All work authorized by such building permit is carried to completion in accordance with the terms of the permit.

the basis of the parking spaces provided on the adjacent lot pursuant to the opinion of Corporation Counsel. Each of the actions indicate that the zoning officials had "information sufficiently complete to permit processing without substantial change or deviation" prior to the adoption of Order 291.

Defendants argue, however, that the information in their possession was not "sufficiently complete" because it was not demonstrated on the plans submitted. Section 8104.7 requires, however, only that the application be accompanied by "information" sufficiently complete to permit processing and not that it be accompanied by "plans" sufficiently complete to permit processing. The distinction is well illustrated by reference to § 8103.5 and § 8103.51 of the zoning regulations. These sections require that "such applications [be] accompanied by the plans and other information required by Subsection 8103.2 sufficiently complete to permit processing without substantial change or deviation." Sub-section 8103.2 requires the submission of plans showing the parking spaces. There is no such requirement under § 8104.71, and it is, therefore, concluded that the information required by that section need not necessarily be provided upon "plans".

Even were such information required to be shown upon plans filed prior to August 9, 1979, the subsequent conduct of the parties, particularly that of defendant Bottner, demonstrates that there was no "substantial change or deviation" in the information filed prior to August 9. When, in November, 1979, plaintiffs filed a new underground parking plan with all of the required parking for the 254 hotel units, both Mr. Glasgow and Mr. Bottner understood that these plans were being offered as a substitute for the plans filed on August 9 and not as part of a new application for the same 254 hotel units. The substitution was made with the full knowledge, consent and approval of Mr. Bottner, and the substitution must be deemed to relate back to the previously filed applications which had already been

certified as complying with the zoning regulations. It did not constitute a new application in the minds of the parties and should not be treated as such.

■ We conclude, as a matter of law, that the finding of the Board of Zoning Adjustment that appellants' applications were not grandfathered by § 8104.7 is so clearly erroneous as to require reversal. *Keefe Co. v. District of Columbia Board of Zoning Adjustment, supra.*

■ It is therefore ordered that the decision from which appellants sought review in No. 81–1235 is reversed and remanded with orders to reinstate appellants' application for a 254-unit Certificate of Occupancy and their 41-unit Certificate of Occupancy and to take whatever further action is required consistent with this opinion. The Superior Court's denial of appellants' motion for summary judgment is not a final order within the meaning of D.C.Code § 11–721 (1981). *Brandon v. Hines,* 439 A.2d 496 (D.C.1981). Therefore, the decision appealed from in No. 81–990 is dismissed for want of jurisdiction.

*So ordered.*