Kindy FRENCH, et al., Petitioners,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,** Respondent,

**Ann Cullen,** Intervenor.

No. 92–AA–1064.

District of Columbia Court of Appeals.

Argued Jan. 7, 1994.

Decided May 15, 1995.

As Amended May 16, 1995.

Richard B. Nettler, Washington, DC, for petitioners.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for respondent.

Whayne S. Quin, with whom Louis P. Robbins, Washington, DC, was on the brief, for intervenor.

Before WAGNER, Chief Judge,* and TERRY and KING, Associate Judges.

TERRY, Associate Judge:

The Board of Zoning Adjustment ("the Board" or "the BZA") granted Ann Cullen's application for area variances and a special exception, enabling her to modify and lease a building which she owns on Leroy Place, N.W., as office space for a non-profit organization. Two neighbors who had opposed the application, Kindy French and Emanuel Friedman, filed a motion for reconsideration, which the Board denied. Ms. French and Mr. Friedman then filed a petition in this court seeking review of both the original order and the denial of their motion to reconsider. Before us they make several arguments: (1) that the Board's order is moot because the non-profit organization to which

Mrs. Cullen intended to rent the building eventually decided to lease other premises; (2) that the Board erred in denying their motion for reconsideration when it was learned after the hearing that Mrs. Cullen had attempted to have the building assessed as residential property, whereas during the hearing she had persuaded the Board that residential use was unreasonable; (3) that the Board's order has expired because Mrs. Cullen failed to apply for either a building permit or a certificate of occupancy in the six months following issuance of the order, as required by 11 DCMR § 3104.1 (1994);[1] (4) that the portion of the order which granted the special exception was not supported by substantial evidence and did not conform to the District of Columbia Comprehensive Plan; and (5) that the portion of the order which granted one of the area variances was not supported by substantial evidence. We find all but the third argument to be without merit. Moreover, while we agree with the third argument and hold that the effectiveness of the Board's order was not tolled by the filing of this petition for review, we nevertheless conclude that under *Mendes v. Johnson*, 389 A.2d 781 (D.C.1978) (en banc), this holding should be applied only prospectively, to BZA orders entered on or after the date of this opinion. Accordingly, we affirm the order under review.

I

At issue in this case is a four-story building located at 2110 Leroy Place, N.W., within the Sheridan–Kalorama Historic District.[2] Mrs. Cullen and her family have owned the building for more than fifty years, during

---

* Judge Wagner was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on June 14, 1994.

1. The present zoning regulations took effect in September 1991, a few months after Mrs. Cullen filed her application. While the substance of the pertinent regulations remained unaltered, some of the section numbers were changed in the 1991 revision. In this opinion, all references to the regulations will cite the current section numbers in the latest (1994) codification.

2. The building sits on a trapezoid-shaped, almost triangular lot facing Leroy Place on the north. It has a frontage of 45.48 feet along Leroy Place, a

depth of 116.74 feet along a public alley to the east, a width of 7.49 feet at the south, and a depth of 113.33 feet along the property line to the west. It is a semi-detached brick building with a full basement, built in the late 1930s. The area of the lot is approximately 2,928 square feet.

The surrounding area is developed with a mix of uses. Most of the neighboring properties are residential, but there are also several chanceries and buildings occupied by non-profit organizations. Across the street, on the other side of Leroy Place, are several four-story row houses and a nine-story hotel.

which time they have leased it to various tenants, mainly foreign governments. The most recent tenant was the government of Italy, which used the building as office space for its embassy's military attaché. The Italian government vacated the premises in May 1990.

The seeds of the present dispute were planted on June 12, 1991, when Mrs. Cullen applied to the Board for area variances and a special exception so that she could modify the property and lease it to a non-profit organization called the Council for Early Childhood Professional Recognition ("the Council").[3] Until that time, the building had been zoned for residential purposes only,[4] despite its longtime use as a chancery.[5] Moreover, Mrs. Cullen sought permission to make improvements on the property, such as building an enclosed fire stair, which would require the addition of a fourth-floor porch.

Mrs. Cullen's application involved two sets of zoning regulations. First, since the building already exceeded the permissible lot occupancy for an R–3 zone,[6] she requested a variance relieving her from the requirements of 11 DCMR § 2001.3(a), which provides that a non-conforming structure and any additions made to it must conform to the percentage-of-lot occupancy requirements for its zoning classification. Although the proposed improvements would not consume any additional lot space, an area variance was needed so that the structure as a whole would conform to the pertinent zoning regulations.

In addition, Mrs. Cullen sought a variance from the requirements of 11 DCMR § 217.1(b), which provides that an existing residential structure may not be used for office space by a non-profit organization unless it contains at least 10,000 square feet of gross floor area. Although the Leroy Place building allegedly had a gross floor area of only 8,782 square feet at the time Mrs. Cullen filed the application,[7] she stated that the proposed modifications would increase the floor area to 10,702 square feet.[8] In addition, Mrs. Cullen applied for a special exception under 11 DCMR § 217.5, which states that any additions to buildings occupied by non-profit organizations "shall require the prior approval of the Board." [9]

In September 1991 the District of Columbia Office of Planning ("the OP") recommended that the Board conditionally approve Mrs. Cullen's application.[10] Specifically, the OP concluded that Mrs. Cullen's request for an area variance under 11 DCMR § 217.1

---

3. Mrs. Cullen had entered into an agreement in September 1990 to lease the building to the Council, which would use it as office space for approximately thirty-five employees. The Italian military attaché (the prior tenant) had forty employees.

4. The property is in an R–3 zoning district. Such districts are

designed essentially for row dwellings, but there shall be included in an R–3 district areas within which row dwellings are mingled with one-family detached dwellings, one-family semi-detached dwellings, and groups of three (3) or more row dwellings. To maintain a family-life environment, permitted related uses are the same in R–3 districts as in R–1 districts.

11 DCMR § 320.1.

5. Mrs. Cullen and her family have owned the property since 1939. From 1945 to 1953 the building was occupied by the Chinese Commission on Aeronautical Affairs. The Italian government leased it from 1953 to 1990.

6. R–3 zoning permits only a forty percent lot occupancy, whereas Mrs. Cullen's building occupied seventy-seven percent of the lot prior to any

of the proposed improvements. See 11 DCMR § 403.2.

7. There was some uncertainty before the Board about the current gross floor area of the building, but the Zoning Administrator recalculated the figure and found it to be 9,572 square feet.

8. In its final order, the Board rejected this figure and found that the gross floor area after the proposed modifications would be 9,990 square feet.

9. In the alternative, Mrs. Cullen also asked the Board to grant a variance from the requirements of 11 DCMR § 2003, which allows for a change in the use of a structure so long as the proposed use will be "either a dwelling, flat, apartment house, or a neighborhood facility." 11 DCMR § 2003.5. Both the Office of Planning and the Board rejected this request for a use variance, and Mrs. Cullen has not filed a cross-petition in this court challenging that ruling.

10. The Office of Planning recommended that the Board impose several conditions on Mrs. Cullen and the Council. The Board's order includes these restrictions plus an additional one.

was reasonable because the building's square footage would comply with the regulation after the proposed additions were completed. Moreover, the OP noted that the proposed addition "is needed, in part, to satisfy the fire and building code. Therefore, the addition has its own merit, removing the main objection to the application of Section [217.1]." Finally, considering the building's long history of office use, the OP acknowledged that "major alterations to the interior of the building would be required" to convert it back to residential use.

In the meantime, dozens of area residents submitted letters opposing Mrs. Cullen's application, most of whom argued that the neighborhood already had an oversupply of vacant office space, and that the parking and delivery demands of the Council's offices would significantly impair the quality of life in the neighborhood.[11] Among those opposing the application was Frank Smith, a member of the Council of the District of Columbia from Ward 1, where the property is located. Councilman Smith asserted that the proposed office use "would have an adverse impact on traffic, parking, loading, and noise on the residential population" in the 2100 block of Leroy Place. In addition, the Advisory Neighborhood Commission for the Sheridan–Kalorama area (ANC 1–D) passed a resolution opposing the application.

On September 25, 1991, the Board held a public hearing on Mrs. Cullen's application. Extensive testimony was presented by several witnesses, some favoring the application, some opposing it. During the hearing Mrs. Cullen submitted a report prepared by Osborne R. George, a traffic analyst, comparing the impact that the Italian military attaché had had on the neighborhood with the projected impact of the Council's occupancy. According to his report, the attaché had forty employees, compared with the Council's thirty-five; that all forty drove to work, whereas only four of the Council's employees would do so (the rest relied on public transportation); and that the attaché received ten to fifteen more daily deliveries than the Council was expected to receive. Additionally, the attaché regularly had an average of thirty daily visitors, occupied twenty-three on-street parking spaces, three of which were reserved exclusively for diplomatic vehicles, and often held evening activities. By contrast, Mr. George projected that the Council would have visitors infrequently, would occupy no parking spaces on the street,[12] and would be closed at night.

Thomas Cullen, the applicant's husband, testified about the history of the building. He also noted that the building is much larger than any other residential structure on the block. Real estate agents had estimated its value as a residence to be between $600,000 and $800,000, but they had also said it would be difficult to convert it back to residential use. The agents had told Mr. Cullen that the best use for the building would be as a chancery or as office space for a non-profit organization. Following this advice, the Cullens decided that the Council would be a suitable occupant, especially because its proposed use was substantially less of a burden on the neighborhood than the recent use by the Italian military attaché. An architect, Cal Bowie, testified that the percentage-of-lot occupancy variance was needed in order to bring the building into compliance with the building code by installing a second emergency exit.

In opposing the application, George Colver, chairman of the Committee of 100 on the Federal City, urged the Board not to grant the variance in light of the fact that the Office of Planning had recommended that section 217 be deleted from the zoning regulations, and that a decision by the Zoning Commission on the OP's proposal was expected in the near future.[13]

11. The OP observed, however, that according to Mrs. Cullen "the proposed use would attract very few visitors to the site. Virtually all transactions would be handled by telephone or correspondence, and almost all business meetings would be held off-site. The Council anticipates an average of four deliveries per day."

12. The Council agreed to provide off-street parking for its four employees who drove to work.

13. In a memorandum filed contemporaneously with the hearing, the Office of Planning advised the Board of its proposal to repeal section 217. The OP conceded, however, that "the Zoning Commission has not discussed these proposals in

Petitioner Kindy French, who lives at 2120 Leroy Place, gave a statement to the Board. In addition to reiterating other arguments already made in opposition to the application, Ms. French pointed out that, according to an architect, the building at 2110 Leroy Place could be returned to residential use "for a price less than that of the office conversion that the applicants propose." [14]

A few weeks later the Board voted unanimously [15] to grant Mrs. Cullen's application, with several restrictions as set forth in the Board's minutes:

1. The number of employees at the subject site shall not exceed thirty-five;

2. The hours of operation shall be restricted to normal daytime business hours.

3. The applicant [or her tenant] shall lease off-street parking spaces to accommodate employees who drive to the site.

4. All large meetings and conferences shall be held [elsewhere].

5. All deliveries shall be made through the basement door located adjacent to the public alley. No deliveries shall be accepted through the Leroy Place entrance.

6. The applicant shall establish and maintain a community liaison program, in cooperation with the Advisory Neighborhood Commission, which shall provide a forum for addressing issues and concerns of the facility and its neighbors as necessary.

In due course the Board issued its final order. It found that, in light of the lot's irregular shape, its steeply sloping grade, and the building's large size and previous use as a chancery, exceptional conditions were present which warranted approval of the requested variances. Furthermore, the Board

emphasized that the proposed use by the Council was "less intense" than the previous use by the Italian military attaché in many critical respects, such as the number of employees, traffic generation, and on-street parking demands.

The Board also said that the 10,000–square–foot requirement contained in section 217.1 of the zoning regulations was intended "to establish a standard of reference, not an inflexible rule," and thus could be waived in an appropriate case. In addition, the Board reasoned that "[t]he proposed addition of the fire stair is necessary to ensure the fire safety of the building and is not proposed merely to increase the size of the structure in an attempt to meet the 10,000 square feet requirement." Responding to complaints by some of the neighbors that the proposed use of the building would increase the risk of criminal activity at night when the building was unoccupied, the Board found that "reinstitution of a viable use will alleviate the security impacts presently presented by an existing vacant building."

Given these factual findings, the Board concluded that "the proposed use, as hereinafter conditioned, is in harmony with existing uses and structures in the area, several of which include higher intensity residential and institutional uses." Thus, subject to the six conditions it had already approved, the Board granted a special exception to permit the Council, as a non-profit organization, to occupy the building, and granted the area variances which Mrs. Cullen had requested.[16]

Petitioners filed a motion for reconsideration with the Board, asserting that the Council no longer was interested in renting the building, that Mrs. Cullen had listed the

detail or held public hearings on them. These proposals have no legal force at this time." In its final order, the Board concluded that the OP's proposal was irrelevant to the disposition of Mrs. Cullen's application.

14. Ms. French submitted a letter from the architect, John Thompson, stating that 2110 Leroy Place "is viable for a residential renovation." He estimated that such a renovation would reduce the size of the house to 7,800 square feet and would cost between $375,000 and $450,000. Mrs. Cullen, on the other hand, obtained two preliminary cost estimates from experienced ren-

ovation contractors. One of them said that a renovation would cost between $600,000 and $800,000; the other said it could go as high as $1.5 million. Mrs. Cullen's architect testified that these figures were consistent with his experience.

15. One member did not vote because she had not been present at the hearing.

16. The Board derives its authority to grant variances and special exceptions from 11 DCMR §§ 3107–3108.

property for sale as appropriate for chancery or residential purposes, and that Mrs. Cullen had applied to the Board of Equalization and Review to have the property reassessed as residential property, rather than commercial property, for tax purposes. In light of these developments, petitioners asserted, the Board's order should be vacated as moot because the Board's decision and the conditions placed upon its approval of Mrs. Cullen's application had been based on the specific proposal for use by the Council. Furthermore, said the motion, Mrs. Cullen's attempt to have the building reassessed negated her assertion at the hearing that the building was unfit for residential use.

In its order denying Ms. French's motion, the Board said that its decision "to approve the use of the [building] by a non-profit organization subject to the specified conditions applies generally to its use by any non-profit organization which complies with the conditions imposed by the Board." Moreover, the Board observed that its order provided Mrs. Cullen with a permissive, not mandatory, use of the structure, and that under the regulations she had the prescribed period of time (six months) to make the building available as office space for a non-profit organization, or else the order would expire. *See* 11 DCMR § 3104.1.

## II

■ Petitioners contend that the Board's order granting Mrs. Cullen's request for area variances and a special exception should be vacated as moot because the Council has decided not to occupy the property. In the alternative, petitioners claim that the Board's order no longer has any legal effect, since Mrs. Cullen failed to apply for a building permit or certificate of occupancy within the time prescribed by regulation.

We reject petitioners' mootness argument. First, as a factual matter, the Board's order granting Mrs. Cullen's application did not require, or assume, that the building would be leased to any particular non-profit organization. As long as the tenant agreed to

abide by the limitations imposed by the Board's order, Mrs. Cullen was free to lease the property to any non-profit organization that she might choose. Of course, since the pending lease to the Council was at issue when Mrs. Cullen's application came before the Board, the resulting order and findings of fact do make specific reference to the Council. But there is nothing in the Board's order suggesting that occupancy by the Council was a necessary condition to the grant of the special exception or the area variances. Petitioners suggest that "other non-profit organizations may have different impacts on traffic and the neighborhood simply because of the number of employees to be housed, the number of deliveries or visitors to the property from the particular use, how many employees use public transportation and how many employees walk to work," but their concern is unfounded because of the conditions included in the Board's order. Any tenant, now or in the future, would have to comply with those conditions, or else it could not occupy the building.

■ Furthermore, petitioner's argument runs contrary to the well-established principle that any conditions imposed on the granting of a variance, "like the variance itself, must run with the land." *National Black Child Development Institute v. District of Columbia Board of Zoning Adjustment,* 483 A.2d 687, 691 (D.C.1984) (citations omitted). Indeed, the conditions set forth in the Board's order in this case could not lawfully have been applied only to the Council. "Personal conditions impermissibly regulate the business conduct of the owner, rather than the use of his property, and are unlawful *per se.*" *Id.* (footnote omitted); *see also Dexter v. Town Board of Town of Gates,* 36 N.Y.2d 102, 104, 324 N.E.2d 870, 871, 365 N.Y.S.2d 506, 508 (1975) (special exception applies without regard to identity of person who owns or occupies building). Thus the Board properly ruled that the limitations imposed on the variances granted to Mrs. Cullen could, and would, be applied to any organization that leased the property.[17]

---

17. Petitioners also contend that under "estoppel principles" this case should be remanded for reconsideration in light of Mrs. Cullen's efforts to

have the building reclassified as residential property for taxation purposes. They do not press this point with vigor, however, nor do they cite a

Finally, petitioners claim that the Board's order no longer has any legal effect because Mrs. Cullen failed to apply for a building permit or certificate of occupancy within six months from the date of the Board's order.[18] In opposing this argument, Mrs. Cullen cites an advisory opinion, issued in December 1977 by the Office of the Corporation Counsel, which concluded that "the running of the six-month period for applying for a permit under a Board decision is tolled by the filing and pendency of ... a petition for judicial review." 2 Ops.Corp.Counsel 238, 242 (1977). Despite clear statutory language to the contrary,[19] the Corporation Counsel concluded that to require a successful applicant "to undertake prompt construction of a structure" before a final decision by a reviewing court would be impractical because the court might well reverse the Board's order approving the application. *Id.* at 241. In the absence of any case law from this court, the Corporation Counsel relied on *Tantimonaco v. Zoning Board of Review,* 102 R.I. 594, 232 A.2d 385 (1967), and *Belfer v. Building Commissioner,* 363 Mass. 439, 294 N.E.2d 857 (1973). In *Tantimonaco* the Supreme Court of Rhode Island held that, despite contrary statutory authority,

> common prudence understandably acts as a brake against incurring obligations, the benefits of which would be cancelled by an adverse decision of this court.... [W]e think it clear that the requirement of activating a permit set forth in an ordinance does not apply during such time as the legality of a permit is open to question by reason of litigation amounting to an appeal from the issuance thereof.

102 R.I. at 599, 232 A.2d at 388. *Belfer* is to the same effect. Mrs. Cullen relies heavily on *Tantimonaco* and *Belfer* in asking us to hold that her time for obtaining a building

permit has been tolled by the filing of the instant petition for review.

Petitioners, understandably, disagree and urge us instead to follow the reasoning of *Gold v. Kamin,* 170 Ill.App.3d 312, 524 N.E.2d 625, 120 Ill.Dec. 595 (1988). In *Gold* the Appellate Court of Illinois rejected the reasoning of *Tantimonaco,* concluding that, in light of the applicable administrative review statute and court rules, "a stay must ordinarily be sought and granted in order to toll the running of a time period in an administrative variance proceeding." *Id.* at 315, 524 N.E.2d at 627, 120 Ill.Dec. at 597. Petitioners bolster their argument by citing our own decision in *Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board,* 500 A.2d 987 (D.C.1985), in which we struck down another Corporation Counsel opinion that was contrary to a statute:

> We now hold, however, that both the Corporation Counsel's opinion and the Board's ruling based upon it are erroneous because they are contrary to the plain meaning of the statute.... We must give effect to the legislative intent insofar as we can discern it from the statutory language.

*Id.* at 990–991 (citation omitted).

 We agree with petitioners that, under *Gold* and *Upper Georgia Avenue,* the order issued by the Board has expired because Mrs. Cullen failed to apply for a building permit within six months, as the regulation requires, and because her time for doing so has not been tolled by the filing of the instant petition for review. The plain language of D.C.Code § 1–1510(a) could not be clearer. It states, without any ambiguity, that the filing of a petition for review in this court "shall not" operate to stay the effect of an agency's order. The statute simply will not permit a court—or an administrative agency such as the BZA—to accept the con-

---

single case in support of their argument. We find no merit in it, especially since the Board made clear that its decision merely allowed a permissive, not a mandatory, use of the building.

**18.** 11 DCMR § 3104.1 provides:

No order of the Board authorizing the erection or alteration of a structure shall be valid for a period longer than six (6) months unless,

within that period, the plans for the erection or alteration are filed for the purpose of securing a building permit.

**19.** D.C.Code § 1–1510(a) (1992) states in pertinent part: "Filing of a petition for review shall not in itself stay enforcement of the order or the decision of the Mayor or the agency, as the case may be."

trary view of the Corporation Counsel.[20] This point has been settled at least since 1985, when *Upper Georgia Avenue* was decided. Moreover, under D.C.Ct.App.R. 18, a party may apply to this court for a stay of an agency order pending appellate review, which Mrs. Cullen failed to do.[21] This fact, when viewed in conjunction with Mrs. Cullen's uncontested failure to obtain, or even to seek, a building permit within the prescribed period of time, leads us inexorably to conclude that the Board's order was not tolled by the filing of the instant petition.

We are mindful nevertheless that, until today, the standard practice in the District of Columbia has been to accept the view of the Corporation Counsel, wrong as it is, that such a tolling occurs. Indeed, at oral argument counsel for both the Board and Mrs. Cullen asserted that the Corporation Counsel's opinion was widely assumed to be still in effect when the petition for review was filed in this case, and that, as a consequence, any changes to the established tolling practice should be prospectively applied. We invited the parties to file supplemental briefs on this issue after oral argument. Petitioners asserted in their supplemental filing that Mrs. Cullen failed to demonstrate any reliance on the Corporation Counsel's opinion and that the rule of prospective application announced in *Mendes v. Johnson, supra,* should therefore not apply. Mrs. Cullen, in response, attempted to distinguish *Upper Georgia Avenue* and reiterated her argument that we should follow *Tantimonaco* and *Belfer.*

■ In deciding whether to apply a new rule of law retroactively or prospectively, this court considers several factors, including (1) the extent of reliance by the parties on the previous rule, (2) the need to avoid any alteration of property or contract rights, (3) the policy of rewarding plaintiffs who seek to initiate just changes in the law, and (4) the desire to avoid unduly burdening the admin-

istration of justice with retroactive changes in the law. *Mendes v. Johnson, supra,* 389 A.2d at 789; *accord, Sanders v. Sanders,* 602 A.2d 663, 667 (D.C.1992). We do so in this case, focusing particularly on the first factor and, to a lesser degree, on the second. In *Mendes* a majority of the en banc court concluded that "[w]here retroactive application of a new rule would result in substantial disruption of settled transactions and/or injustice to a party because of reliance on the continued validity of the prior legal rule— especially one of long standing—courts are extremely reluctant to accord retroactive effect to overruling decisions." 389 A.2d at 789. The court went on to stress that any reliance must be reasonable in order to avoid retroactive application of the new rule. *Id.* at 790.

■ Applying this standard in the factual setting of this case, we are satisfied that both Mrs. Cullen and the Board reasonably relied on the Corporation Counsel's opinion. We note, first of all, that no decision of this court has ever squarely addressed the precise issue at hand. Thus, while our holding today does not represent a new rule in the sense that it overrules prior law in the District of Columbia, it certainly decides "a matter of first impression in a manner not clearly foreshadowed." *Sanders v. Sanders, supra,* 602 A.2d at 667 n. 5. Although the opinions of the Corporation Counsel are not valid legal authority, the mere fact that they have been issued by the city's top legal officer may cause interested persons (and government agencies) to rely on them in good faith, in the belief that following the Corporation Counsel's advice will present no legal hazards. The Corporation Counsel's opinion was issued in 1977 and, until now, has never been challenged in this court. Mrs. Cullen and the Board have asserted, without contradiction from petitioners, that successful parties before the Board traditionally have not

---

20. Our holding is not affected by the fact that the six-month limit arises from a regulation (11 DCMR § 3104.1, *supra* note 18) rather than a statute. Given our controlling precedent in *Upper Georgia Avenue,* we conclude that the Corporation Counsel has no authority to modify either a statute or a regulation, and that any opinion of the Corporation Counsel that conflicts with ei-

ther a statute or a regulation is necessarily invalid.

21. Nor does it appear that she sought a stay from the Board itself. Assuming that the Board's own rules allow it to grant such a stay, section 1–1510(a) would not preclude it from doing so.

obtained either a certificate of occupancy or a building permit until judicial review has been completed. *See Upper Georgia Avenue, supra*, 500 A.2d at 990 (absent overruling decision by this court, Board was entitled to rely on Corporation Counsel opinion as a guiding statement of law). In these circumstances we conclude that our holding today should be "purely prospective," which means that it will apply only to BZA orders entered on or after the date of this opinion, and that it has no application to the order on review in this case. *Mendes v. Johnson, supra*, 389 A.2d at 789 n. 21. We recognize that such a purely prospective holding is unusual, *see Robinson v. Washington Internal Medicine Associates*, 647 A.2d 1140, 1146 n. 7 (D.C.1994) (opinion of King, J.), but given the long history of this case and the hardship that would result if we were to ignore Mrs. Cullen's reasonable reliance on the Corporation Counsel's opinion, *see Mendes v. Johnson, supra*, 389 A.2d at 789–790, we conclude that a purely prospective rule is the fairest under the circumstances presented here.[22]

### III

Petitioners maintain that the Board's grant of a special exception permitting Mrs. Cullen to lease her building to a non-profit organization is not supported by substantial evidence and is inconsistent with both the District of Columbia Comprehensive Plan, D.C.Law No. 5–76 (1984), and existing case law. In particular, petitioners argue that the Board misapplied the provisions of 11 DCMR § 217, noting that the building has a gross floor area of less than 10,000 square feet and that it was not used for residential purposes before Mrs. Cullen filed her application, and arguing that the Board failed to make adequate findings about the number and placement of on-site parking spaces or the adequacy of off-site arrangements.

■■■■ Our three-part standard of review is a familiar one. We must determine (1) whether the agency made findings of fact on each materially contested issue of fact, (2) whether substantial evidence supports each finding, and (3) whether the Board's conclusions flow rationally from its findings of fact. *Levy v. District of Columbia Board of Zoning Adjustment*, 570 A.2d 739, 746 (D.C. 1990); *Perkins v. District of Columbia Department of Employment Services*, 482 A.2d 401, 402 (D.C.1984); D.C.Code § 1–1510(a)(3)(E). "We must uphold decisions made by the BZA if they rationally flow from findings of fact supported by substantial evidence in the record as a whole." *Draude v. District of Columbia Board of Zoning Adjustment*, 582 A.2d 949, 953 (D.C.1990) (citations omitted). Moreover, because the Board is charged with interpreting the zoning regulations, *Page Associates v. District of Columbia Board of Zoning Adjustment*, 463 A.2d 649, 655 (D.C.1983), "[t]his court must defer to the Board's interpretation of those regulations, related to matters within its expertise, unless that interpretation is plainly wrong or inconsistent with the regulations or with the statute under which the BZA acts." *Concerned Citizens of Brentwood v. District of Columbia Board of Zoning Adjustment*, 634 A.2d 1234, 1242 (D.C.1993) (citations omitted); *accord, Dietrich v. District of Columbia Board of Zoning Adjustment*, 320 A.2d 282, 286 (D.C.1974). Guided by these principles, we are satisfied that the Board properly considered and addressed all relevant factors in approving Mrs. Cullen's application.

■■■■ Under the zoning regulations, "the Board is authorized to grant special exceptions ... where, in the judgment of the Board, those special exceptions will be in harmony with the general purpose and intent" of the regulations. 11 DCMR § 3108.1. In evaluating requests for special exceptions, the Board "is limited to a determination whether the exception sought meets the requirements" of the particular regulation on

---

**22.** Counsel for the Board has informed us that the Zoning Commission recently amended the zoning regulations by adding a new regulation, 11 DCMR § 3104.5, 42 D.C.Reg. 2115 (1995), which essentially codifies the tolling rule set out in the 1977 opinion of the Corporation Counsel. Since this amendment did not become effective until more than two and a half years after the BZA order at issue here and does not purport to be retroactive, we conclude that it has no effect on the outcome of this case. We express no view here as to whether the new section 3104.5 may be in conflict with D.C.Code § 1–1510(a).

which the application is based. *Stewart v. District of Columbia Board of Zoning Adjustment*, 305 A.2d 516, 518 (D.C.1973). The applicant has the burden of showing that the proposal complies with the regulation; but once that showing has been made, "the Board ordinarily must grant [the] application." *Id.; see First Baptist Church v. District of Columbia Board of Zoning Adjustment*, 432 A.2d 695, 698 (D.C.1981).

 Petitioners maintain, and we agree, that only "existing residential buildings" may be converted to office use by a non-profit organization under 11 DCMR § 217.1.[23] We part company with petitioners, however, over their assertion that a building must be both zoned for residential use and actually used for residential purposes in order to qualify under section 217.1. Instead, we sustain the Board's conclusion that the phrase "existing residential buildings" requires only that a structure be residentially zoned, not that it be in actual use as a residence, in order to qualify for use by a non-profit organization. As the Board explained in its order:

> The Board has previously applied the provisions of 11 DCMR [§ 217.1] to residentially zoned buildings which were not devoted to residential use at the time of the Board's consideration of the cases. The Board believes that the intent of the Zoning Regulations was to permit both the conversion of residential uses and the continuance of non-residential uses subject to Board review and approval.

 We uphold the Board's construction of section 217.1 for two primary reasons. First, as we have mentioned, this court must accept the Board's interpretation of the zoning regulations unless that interpretation is plainly erroneous or inconsistent with the regulation itself. *Concerned Citizens, supra*, 634 A.2d at 1242. Since the actual language of the regulation could reasonably be read either as the Board reads it or as petitioners read it, we must accept the Board's interpretation. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Commission*, 431 A.2d 560, 565 (D.C. 1981). Indeed, it is in these types of situations—when the language used in the regulation is less than precise—that the Board's construction is most useful, for it is the Board's duty to assure that special exceptions are issued in a manner that is "in harmony with the general purpose and intent of the Zoning Regulations." 11 DCMR § 3108.1. Furthermore, as Mrs. Cullen demonstrates in an appendix to her brief, the Board on at least four prior occasions has interpreted the regulation concerning non-profit organizations in a manner consistent with its ruling here.

Second, since applications for special exceptions under section 217.1 are not granted as a matter of right but are evaluated on a case-by-case basis, there is little danger that the issuance of a special exception in this case will establish a precedent permitting a flood of non-profit organizations into any particular zoning district. Rather, the careful and thorough scrutiny given by the Board to the application in this case reflects the nature of the burden which any applicant must satisfy when seeking a special exception.

Furthermore, we find it unreasonable, particularly under the facts of this case, to limit section 217.1 to buildings which are being used for residential purposes at the time the application is filed. Before the Board Mr. Cullen testified that, given the size and location of the building, it was not appropriate for residential use. He pointed out that the building overlooks a hotel parking lot with one side abutting the Guinean chancery, while the other side faces the dumpsters and parking lots behind several buildings along

---

**23.** Section 217.1 states, in pertinent part, that "[t]he use of existing residential buildings ... by a non-profit organization for the purposes of the non-profit organization shall be permitted," if approved by the Board, subject to certain conditions as set forth in the regulation (such as the requirement that the gross floor area be at least 10,000 square feet). At issue here is the meaning of the term "existing residential buildings."

Connecticut Avenue, which is just half a block away. In addition, the architect, Mr. Bowie, testified that the building generally would not be a desirable residence and explained his reasons for saying so. Given this evidence, we find the Board's construction of section 217.1 to be reasonable and in harmony with the regulations as a whole.

Moreover, as Mrs. Cullen emphasizes in her brief, the Board made detailed findings as to the impact that the presence of a nonprofit organization would have on the parking situation in the neighborhood. Significant also are the conditions placed on the special exception, which were mostly aimed at minimizing the congestion generated by the non-profit occupant of Mrs. Cullen's building. In particular, the Board noted:

> The proposed non-profit office use is less intense than the previous chancery use in terms of number of employees, *traffic generation and on-street parking impacts.* The impacts of the proposed use on nearby residential uses are minimal due to the physical separation of the premises from residential uses and the conditions hereafter imposed by the Board. [Emphasis added.]

On this point also, we find no reason to disagree with the Board. The report by Mrs. Cullen's traffic expert, Osborne George, supported the Board's finding that the proposed use would, in many respects, be less intrusive than the use made by the building's previous occupants. In addition, to ensure that the actual traffic resulting from the proposed non-profit use closely mirrored the projections made by the expert, the Board imposed stringent limitations on the use of the property.[24]

We turn next to petitioners' claim that the Board's order violates the Comprehensive Plan. Specifically, petitioners argue that the Comprehensive Plan, as amended, explicitly designates the area surrounding the Cullen property for "moderate density residential" use.[25] Relying on this provision, and on the

proposal by the Office of Planning to rescind section 217 altogether, petitioners claim that the Board should not have granted the special exception.

 This court has held, however, that "the Zoning Commission is the exclusive agency vested with the responsibility for assuring that the Zoning Regulations are not inconsistent with the Comprehensive Plan." *Tenley & Cleveland Park Emergency Committee v. District of Columbia Board of Zoning Adjustment,* 550 A.2d 331, 341 (D.C. 1988), *cert. denied,* 489 U.S. 1082, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). Given this holding, we must decline to consider petitioners' arguments based on the Comprehensive Plan, since the Zoning Commission has not been heard from in this case (nor, as far as we know, have its views been sought). The Board's limited function is to assure that the regulations adopted by the Zoning Commission are followed; it has "no authority to implement the Comprehensive Plan." *Id.* at 341 n. 22. This court's role, in turn, is to determine whether the Board did its job properly. Thus the only question before us is whether the Board correctly followed the regulations—not the Comprehensive Plan— in granting Mrs. Cullen's application.

In any event, even though the Comprehensive Plan categorizes Leroy Place as a "moderate density residential" area, this does not mean that the buildings on Leroy Place must be devoted exclusively to residential use. The implementing regulation for this portion of the Comprehensive Plan states that "row houses and garden apartments" should constitute the "predominant," not exclusive, use in such an area. 10 DCMR § 1103.2 (1994).

For these reasons we reject petitioners' challenge to the granting of the special exception.

### IV

 Finally, petitioners contend that the Board erred in granting the area variance

---

24. See page 1028, *supra.*

25. *See* Amendment to the District of Columbia Comprehensive Plan Act of 1984, D.C.Law 8–138, § 2, 37 D.C.Reg. 55, 82 (June 5, 1990), which provides:

The area bounded by Connecticut Avenue, N.W., Leroy Place, N.W., the west side of Phelps Place, N.W., and the south side of Bancroft Place, N.W., is included in the moderate density residential land use category.

which relieved Mrs. Cullen from the 10,000–square–foot requirement of section 217.1. In its findings of fact, the Board extensively explained the basis for its decision to grant this variance. First, the Board noted that the Zoning Commission never intended the requirement to be inflexible, but that it was merely designed to establish a "standard of reference" which could be waived or modified in appropriate cases. The Board also emphasized that "the requested variance relief requires the showing of exceptional circumstances inherent in the property which creates a practical difficulty upon the owner."

After reviewing the evidence, the Board found that such exceptional circumstances existed, given the site's "irregular shape, steeply sloping grade, the large size and physical configuration of the existing building, and its previous history of chancery use." On the basis of this finding, the Board concluded that "it is not reasonable to consider the building for single-family purposes due to its size, configuration, and history, and that the variance will ensure the preservation of and continued use of the existing structure."

 Applying the long-established substantial evidence test, we have no difficulty in affirming the Board's order. As this court has held:

> The Board is empowered ... to grant an area variance where it finds three conditions: (1) the property is unique because, *inter alia*, of its size, shape, or topography; (2) the owner would encounter practical difficulties if the zoning regulations were strictly applied; (3) the variance would not cause substantial detriment to the public good and would not substantially impair the intent, purpose and integrity of the zoning plan.

*Roumel v. District of Columbia Board of Zoning Adjustment,* 417 A.2d 405, 408 (D.C. 1980). The record demonstrates that the Board considered these three elements and found that an area variance was appropriate under the circumstances. We find no error in the Board's assessment. Considering the unusual size and shape of the lot and the minor deviation from the 10,000–square–foot

requirement,[26] we cannot say that the variance was unwarranted. The mere fact that petitioners presented contrary evidence as to the feasibility of restoring the structure as a residence is immaterial. As the trier of fact, the Board "may credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other." *United Unions, Inc. v. District of Columbia Board of Zoning Adjustment,* 554 A.2d 313, 315–316 (D.C.1989) (citations and footnote omitted). "We must uphold the Board's decision so long as it is supported by substantial evidence, even though there may also be substantial evidence to support a contrary decision, as there is in this case." *Upper Georgia Avenue, supra,* 500 A.2d at 992 (citations omitted). In these circumstances, we will not disturb the Board's ruling.

V

The decision of the Board of Zoning Adjustment is therefore .

*Affirmed.*